IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SAMUEL FRANCO, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | 1:05-CV-01058 (RMU) |
| | ) | |
| v. | ) | |
| | ) | |
| THE DISTRICT OF COLUMBIA, | ) | |
| NATIONAL CAPITAL REVITALIZATION | ) | |
| CORPORATION and RLA REVITALIZATION | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS

### INTRODUCTION

Plaintiffs are an owner of improved real property located at 2838 Alabama Avenue, S.E., the tenants for property located at 2834 Alabama Avenue, S.E., and D-Mart Inc, which leases these properties from the other plaintiffs and operates a store on the properties. They have filed suit to ask this Court to declare unconstitutional the legislation adopted by the City Council in connection with the revitalization of the Skyland area of Ward 7 and to enjoin the Defendants from attempting to acquire Plaintiffs' property or any part of the Skyland parcels through the power of eminent domain.[1]

As detailed below, the Complaint should be dismissed pursuant to Rule 12(b)(1) because Plaintiffs' title and/or leasehold interests have not been taken and Plaintiffs have not been denied payment for any property. Plaintiffs' claims are at best premature and, more likely, will never be ripe before this Court. No eminent domain action has been filed by NCRC or the RLA

---

[1] This case is related to the Rumber and AutoZone cases pending before this Court. See Rumber v. District of Columbia, C.A. No. 1:04-cv-01170 (RMU); AutoZone, Inc. v. District of Columbia, C.A. No. 1:05-cv-476. As of this writing, the defendants' motions to dismiss are pending in both actions.

Revitalization Corporation (the "RLARC")  Moreover, if and when an eminent domain action is filed, those who are affected (including the property owners and potentially the tenants) have adequate remedies through the process for determination of just compensation in the local courts of the District of Columbia and payments for relocation expenses under federal law.

The Complaint should also be dismissed pursuant to Rule 12(b)(6) because the Complaint fails to state a claim upon which relief can be granted.  First, Plaintiffs' "public use" claim is not supported in the law.  As the U.S. Supreme Court made clear last Thursday in its decision in Kelo v. City of New London, economic revitalization is a valid and recognized public purpose for which eminent domain is available.  The Skyland project and the revitalization of this part of the District is a clear and obvious public use under the Fifth Amendment where government resources are deployed to remove blighted conditions and stimulate economic development in East Washington.

Second, Plaintiffs' due process claims ignore the well-established law that a party affected by a legislative act is not required to be given notice and an opportunity to be heard.

Third, Plaintiffs' claims about the Home Rule Act are contradicted by the terms of the Act and by local case law confirming the Council's wide authority to enact emergency legislation.

Finally, the Plaintiffs have failed to allege facts to support the claim that the acquisition of properties associated with the Skyland project falls within the definition of a "major action" under the District's Environmental Protection Act.

# I.    STATEMENT OF THE CASE

## A.    NCRC's Eminent Domain Authority.

The National Capital Revitalization Corporation ("NCRC") was established in 1998 as an independent instrumentality of the District of Columbia to "effectuate public purposes" including:

> to retain and expand businesses located within the District, attract new businesses to the District, and induce economic development and job creation by developing and updating a strategic economic development plan for the District; providing incentives and assistance; removing slum and blight; and coordinating the District's efforts toward these ends.

D.C. Official Code § 2-1219.02 (2001 ed.). NCRC was established pursuant to an initiative of President Clinton and, following passage of enabling legislation by the City Council, the agency was funded with an initial grant from Congress.

In fulfilling its functions, NCRC has been empowered to acquire and dispose of real property. NCRC was authorized to exercise eminent domain "in furtherance of the public purposes of this subchapter, in accordance with the provisions of subchapter II of Chapter 13 of Title 16 and §§ 16-1314 to 16-1316," the District's general eminent domain statute. D.C. Official Code § 2-1219.19(a). Any exercise of eminent domain must be approved by the Council before condemnation proceedings may be brought. D.C. Official Code § 2-1219.19(b).

RLARC is a subsidiary of NCRC and is the successor to the former Redevelopment Land Agency ("RLA"). D.C. Official Code §§ 2-1219.31, 32. Pursuant to the Act establishing RLARC, the eminent domain power which the former RLA possessed was continued and transferred to RLARC. D.C. Official Code, § 6-301.04. Under the Permanent Skyland Act (challenged in this action), the City Council specifically approved the exercise of eminent domain power by either NCRC or RLARC for these properties. Id. at § 2-1219.19(c)

3

### B.    The Skyland Project.

For over three years, NCRC has been working on what is known as the "Skyland Project." They are a group of properties totaling approximately 18.5 acres on the north side of the intersection of Good Hope Road, Alabama Avenue, and Naylor Road, S.E., in the Hillcrest neighborhood of Ward 7.  About one-third of the property is vacant and undeveloped.  The other two-thirds consists of commercially-zoned property, some of which is used in connection with the "Skyland Shopping Center" and the rest for free-standing commercial buildings and parking areas.  The entire Skyland project area currently consists of 43 different properties, owned by 17 different record title owners plus the District of Columbia.

The Hillcrest neighborhood and surrounding communities have been pressing for the redevelopment of the Skyland area for over ten years, long before the establishment of the NCRC.  The neighbors have complained about the blighted conditions of the area, the on-site crime problems (particularly drug and alcohol problems), the "abandoned" feel of the site stemming from the littering, trash, and deteriorated conditions of the property.  As long ago as July 2001, Advisory Neighborhood Commission 7B adopted a resolution supporting NCRC as the lead agency for redevelopment of the Skyland area, including assembling the properties for redevelopment.

Following extensive analysis, discussions with the community, and review of all options, NCRC's Board adopted a resolution approving a project area designation plan for the Skyland area and authorizing acquisitions for those purposes, including through the use of eminent domain if required.  The redevelopment plan envisions acquisition and consolidation of the disparate parcels and development of a shopping center in conjunction with a development entity composed of local and national developers plus the Marshall Heights Community Development

Corporation and the Washington East Foundation.  The revitalized site will be anchored by the kind of retail (similar to Target or Shopper's Food Warehouse) and other amenities (fine restaurants and community stores) that the community has sought for years and which the neighborhood can support.  In addition to eliminating blighted and hazardous conditions, the redevelopment will replace the haphazard layout and dilapidated conditions with a first-class project.  It is estimated that the redeveloped site will generate 300 construction jobs, 300 new permanent jobs as well as substantial tax revenues for the District, in addition to removing blighted conditions and providing amenities long-requested by the residents.

    C.      **The Skyland Approval Act.**

       In legislation that became effective on April 8, 2005, following the Congressional lay-over period, the District adopted the "National Capital Revitalization Corporation Eminent Domain Clarification and Skyland Eminent Domain Approval Amendment Act of 2004" (the "Permanent Skyland Act").  (A copy of Law 15-286, sometimes referred to in this case as the "permanent" Skyland Act, is attached to this Memorandum as <u>Exhibit 1</u>).  Under the Permanent Skyland Act, the current conditions at Skyland are identified as an impediment to the economic revitalization of this area of the District.  The City Council determined that the redevelopment – and, if necessary, the use of eminent domain to accomplish redevelopment – is consistent with the purposes of the NCRC Act.

       Section 3 of the Permanent Skyland Act reflects findings by the Council about the conditions supporting the possible exercise of the power of eminent domain in the relevant area and the importance of the public purposes associated with redeveloping this part of the District.  Among these findings are:

           1.    The communities east of the Anacostia River, including the areas near the Skyland Shopping Center, have lagged behind

other communities in the District in economic development and have the highest unemployment rates in the District.

2.    Wards 7 and 8, including the neighborhoods surrounding the Skyland Shopping Center remain economically depressed and underserved by the amenities enjoyed by the rest of the District and nearby Maryland.

3.    One of the key reasons why these areas lag behind is because certain critical commercial locations are run down or blighted.

4.    The Skyland Shopping Center is a blighting factor in the Hillcrest and nearby communities.

5.    The Skyland Shopping Center is characterized by underused, neglected, and poorly maintained properties.

6.    These poor conditions of the Skyland Shopping Center have fueled crime and attracted criminal elements to the site and is likely to have increased the incidence of crime in the surrounding neighborhoods. . . .

10.    Neither the police nor the community have been able to secure the cooperation of the current owners to deal with the numerous problems at the site, despite years of efforts.

11.    For over 15 years, residents near the shopping center have petitioned the District to become involved in the redevelopment of the area and the correction of conditions at the site.

12.    The National Capital Revitalization Corporation has advised the Council that the Skyland Shopping Center is blighted and that current conditions are an impediment to the economic revitalization of this area of the District. . . .

15.    The assemblage of the properties comprising the Skyland Shopping Center and the construction of the new shopping center on the site, guided by the policies and requirements of the District government, including the [National Capital Revitalization] Corporation, will further many important public purposes, including: (A) Removal of unsafe and unsanitary conditions; (B) Reduction of the incidence of crime; (C) Removal of garbage and other eyesores; (D) Reorganization and reorientation of the site to make it safer

and more attractive; (E) Expansion of economic opportunities for residents of Wards 7 and 8; (F) Provision of needed job opportunities for residents of Wards 7 and 8; (G) Provision of needed retail options and other amenities for residents of Wards 7 and 8; (H) Revitalization of an economically distressed community; and (I) Increasing and diversifying the tax base of the District.

<u>Exhibit 1</u> at 1-2.

The Permanent Skyland Act had been preceded by emergency and temporary legislation authorizing eminent domain at Skyland. The emergency acts (B 15-829 and 15-952) expired on September 30, 2004, which was the effective date of the temporary act. The temporary act (B 15-830) expired on April 8, 2005, the effective date of the Permanent Skyland Act. (Legislative history and information regarding effective dates for all Skyland acts is available at the Legislative Information Management System at the D.C. Council's website, <u>www.dccouncil.washington.dc.us/lims</u>).

### D. Allegations of the Complaint.

Plaintiff Samuel Franco is the fee simple owner of property located at 2838 Alabama Avenue, S.E. Plaintiffs Samuel, Nathan, and Allen Franco, are lessees of certain adjacent property located at 2834 Alabama Avenue, S.E. (Complaint ¶ 2). Plaintiff D-Mart, Inc. operates a discount store on both properties and leases the properties from the other plaintiffs. (<u>Id.</u> ¶ 2).

Plaintiffs allege in Count I of their Complaint that the Skyland acts constitute a taking in violation of the public use provisions of the Fifth Amendment to the U.S. Constitution. Plaintiffs allege that the acts "authorize defendant NCRC to take plaintiffs' Property by eminent domain solely for private purpose and non-public use, i.e. redevelopment of the Skyland Shopping Center as a shopping center in place of the Skyland Center, create more jobs, increase tax

revenues and otherwise foster economic development" – one of which, Plaintiffs allege, is a public use within the meaning of the Fifth Amendment. (Id. ¶¶ 36-37).

In Count II, Plaintiffs allege that the Skyland acts are unconstitutionally vague and ambiguous and therefore violate the Due Process Clause and the Takings Clause of the Fifth Amendment. Plaintiffs allege that the Skyland acts are vague and ambiguous because they do not "state the public purpose or use for which the Skyland Assemblage is to be acquired, or what is to be made of the Skyland Assemblage, what standards or requirements govern NCRC in acquiring, using or disposing of the Skyland Assemblage or that NCRC is subject to further review or approval by the Council before it may exercise eminent domain powers over the Skyland Assemblage." (Id. ¶ 44). Plaintiff further allege that the acts are vague and ambiguous under the Due Process Clause of the Fifth Amendment to the U.S. Constitution because the Permanent Act authorizes both the NCRC and its subsidiary RLA to commence eminent domain proceedings in their separate names. (Id. at ¶ 45).

Plaintiffs allege in Counts III and IV, respectively, that the Permanent Act deprives Plaintiffs of property in violation of the Due Process Clause of the Fifth Amendment because (i) the Council improperly failed to conduct a public hearing regarding revisions to the temporary and emergency acts before the Council considered and enacted the permanent act (id. at ¶ 50), and (ii) NCRC and/or its redeveloper does not have a commitment from an anchor retail tenant, which was "one of the conditions set or relied on by the Council for the enactment of the Skyland Permanent Act." (Complaint ¶ 54).

Plaintiffs allege in Count V and VI, respectively, that the Council violated the D.C. Home Rule Act by enacting "duplicate" emergency acts and by adopting emergency legislation where there was no emergency within the meaning of the Council Rules. Plaintiffs argue that these

violations render the emergency and temporary acts null and void and, consequently, invalidate any actions taken by NCRC between May 21, 2004 (enactment of emergency legislation) and April 5, 2005 (effective date of Permanent Act) in connection with the Skyland project.

Finally, Plaintiffs argue in Count VII that the Defendants violated the D.C. Environmental Protection Act ("DCEPA") by failing "to prepare and file or cause the preparation and filing of an EIS, which must be approved after public hearing. . . before any actions including the acquisition of plaintiffs' Property or of any other property in the Skyland Assemblage may proceed." (Complaint ¶ 77). Plaintiffs further allege that Defendants' failure to take such actions caused them harm and loss as property owners and as affected members of the public.

Plaintiffs seek a declaration that the Skyland acts are unconstitutional under the Fifth Amendment and were also enacted in violation of the D.C. Home Rule Act; a declaration that the Defendants violated the DCEPA; entry of an injunction preventing the District or NCRC or RLARC from taking any action in furtherance of the Skyland project, and "affirmatively requiring [D]efendants [] to restore the *status quo ante* with regard to ownership of the Skyland Assemblage (Id. at ¶ vi); and an award of damages "for the losses and harm [Plaintiffs] suffered as a result of the actions of the [D]efendants in enacting the Skyland Legislation and in their efforts to acquire [Plaintiffs'] Property and to carry out the Skyland Project." (Id. at ¶ vii).

## II.    ARGUMENT

### A.    Summary Of Argument.

Defendants do not minimize or disparage Plaintiffs' feelings that the redevelopment of Skyland and the consequent disruption of their businesses is stressful. But the question which the Plaintiffs have asked this Court to decide is whether Defendants' *potential* actions are unconstitutional and unlawful. More specifically, Plaintiffs are asking this Court to hold that the Skyland Act is unconstitutional on its face. However, there was no taking of property under the now-expired emergency and temporary acts, and, as of today, there has not been a taking of anyone's property pursuant to the Permanent Act. Plaintiffs have not alleged that there has been a taking without payment of just compensation. Rather, they are arguing that there never can be a constitutional taking under the circumstances presented here.

Plaintiffs' claims are premature because there has not been any taking under the Skyland Act and there may never be if the properties are acquired voluntarily. If and when a property is taken by eminent domain, those entitled to compensation will have a full and fair opportunity to present their case for just compensation and, for that matter, to present any challenges to the authority for the taking. The Court should not render advisory opinions about either the Act or its effect as applied until such time as necessary.

Further, the Permanent Skyland Act is constitutional. It provides approval for the taking by NCRC in an area and for purposes authorized in the original NCRC Act. The purposes of fostering economic development and removing dilapidated and blighted conditions are clear public purposes, which have been documented in the legislative findings of the Permanent Skyland Act, are within the scope of the police power and have been upheld as such by the Supreme Court for over 50 years. Additionally, the Due Process Clause does not require that

10

potentially affected parties be given notice or an opportunity to be heard prior to enactment of a law.

The Court also should reject Plaintiffs' claim that Defendants violated the Home Rule Act or the DCEPA. The Court affords substantial deference to the Council in its assessment of its functions and authority pursuant to the Home Rule Act. It is for the Council to determine whether to enact emergency legislation – once or repeatedly to address the emergency. Moreover, that legislation has long since lapsed and Defendants' challenge to it is moot. Finally, Defendants did not violate the DCEPA since the need for an EIS is triggered – if at all – by implementation of the construction phase of the Skyland Project, not by mere acquisition of property.

**B.      Scope Of Review On Motions To Dismiss.**

On a motion to dismiss pursuant to Rule 12(b)(1):

> the plaintiff bears the burden of establishing that the court has jurisdiction. In evaluating whether subject-matter jurisdiction exists, the court must accept all the complaint's well-pled factual allegations as true and draw all reasonable inferences in the plaintiff's favor. The court is not required, however, to accept inferences unsupported by the facts alleged or legal conclusions that are cast as factual allegations.
>
> Moreover, the court need not limit itself to the allegations of the complaint. Rather, the court may consider such materials outside the pleadings as it deems appropriate to determine whether it has jurisdiction in the case.

Lockamy v. Truesdale, 182 F.Supp.2d 26, 30-31 (D.D.C. 2001) (citations omitted).

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the complaint and, therefore, the court must treat factual allegations as true and draw all reasonable inferences therefrom in plaintiffs' favor. Id. at 31. See also In re U.S. Office Products Securities Litigation,

326 F.Supp.2d 68, 73-74 (D.D.C. 2004).   The Court "need not accept as true inferences

unsupported by facts set out in the complaint or legal conclusions cast as factual allegations." Id.

### C.   The Court Lacks Subject Matter Jurisdiction.

1.   Equitable relief is not available to enjoin eminent domain where state remedies are available.

Plaintiffs invoke this Court's subject matter jurisdiction under 28 U.S.C. § 1331 because

of the alleged violations of the U.S. Constitution.   (Complaint ¶ 1).   However, the courts have

repeatedly held that the constitutional threshold is the exercise of eminent domain and a failure

to pay just compensation for taken property.   Because the Complaint does not properly allege a

constitutional violation and Plaintiffs cannot allege such a violation prior to the exercise of

eminent domain, the Court is without subject matter jurisdiction to hear this case.

On the specific question of a federal court's jurisdiction to entertain a suit to enjoin a

potential taking, the Supreme Court has held that "[e]quitable relief is not available to enjoin an

alleged taking of private property for a public use authorized by law when a suit for

compensation can be brought against the sovereign subsequent to the taking." Ruckelshaus v.

Monsanto Co., 467 U.S. 986, 1016 (1984).   In Williamson County Regional Planning Comm'n

v. Hamilton Bank of Johnson City, in the context of a regulatory taking, the Court reiterated that

there is no cognizable taking claim until an owner has availed itself of the state process for

securing the payment of just compensation:

> The Fifth Amendment does not proscribe the taking of property; it
> proscribes taking without just compensation.   Nor does the Fifth
> Amendment require that just compensation be paid in advance of,
> or contemporaneously with, the taking; all that is required is that a
> "reasonable, certain and adequate provision for obtaining
> compensation," exist at the time of the taking.   If the government
> has provided an adequate process for obtaining compensation, and
> if resort to that process "yields[s] just compensation," then the
> property owner "has no claim against the Government" for a

> taking. . . . Similarly, if a State provides an adequate procedure for
> seeking just compensation, the property owner cannot claim a
> violation of the Just Compensation Clause until it has used the
> procedure and been denied just compensation.

473 U.S. 172, 194-95 (1985) (citations omitted).[2]

Property owners' efforts to obtain relief prior to the commencement of a condemnation process have been rebuffed consistently in this jurisdiction. See, e.g., Donnelly v. District of Columbia Redevelopment Land Agency, 269 F.2d 546, 547 & n.1 (D.C. Cir. 1959) (landowner not entitled to injunction preventing filing of a condemnation complaint to take commercial properties lying between the Maine Avenue waterfront and the area of blight).

In Patel v. City of Chicago, 383 F.3d 569 (7th Cir. 2004), a group of property owners whose properties had been identified in legislation as being within the potential acquisition area for a redevelopment project, filed suit in federal court alleging, among other things, that the designation of their property violated the Equal Protection Clause by singling them out for potential condemnation and that the designation of such parcels for acquisition was arbitrary and capricious and exhibited an animus by the City against the owners. 383 F.3d at 572. The lower court dismissed the case under Rule 12(b)(1) and the Seventh Circuit affirmed the dismissal. In language equally applicable to the present plaintiffs, the Seventh Circuit found that the claim was not ripe:

> The City has not initiated eminent domain proceedings against the
> Plaintiffs' properties, let alone failed to provide just compensation

---

[2]    Last week, the Supreme Court affirmed the essential ripeness holding of *Williamson County*. In San Remo Hotel, L.P. v. City and County of San Francisco, No. 04-340, 2005 WL 1421451 (U.S. June 20, 2005), the Court reiterated that in the context of a regulatory takings challenge, the doors to the federal courthouse remain closed until and unless the state compensation processes have been exhausted although the Court recognized that a facial challenge distinct from compensation issues could be heard in federal court. Id. at No 04-340, slip op. at 21-23, 2005 WL 1421451 at *12-14. The as-applied challenges, however, must be resolved through the states: "[T]here is scant precedent for the litigation in federal district court of claims that a state agency has taken property in violation of the Fifth Amendment's takings clause." Id. at No 04-340, slip op. at 22, 2005 WL 1421451 at *13).

> for taking those properties. Hence, the Plaintiffs have suffered no
> injury under the Constitution. See *Williamson County*, 473 U.S. at
> 195. . . .
>
> Because the Plaintiffs have suffered no injury and will only do
> so if and when the City fails to compensate them justly for their
> properties, their claim is not ripe for review. For this reason, we
> need not consider Plaintiffs' motion to supplement the record,
> which included letters from the City to the Plaintiffs indicating its
> intention to commence eminent domain proceedings. . . . These
> letters do not alter our ripeness analysis, as under *Williamson*
> *County* only documentation showing that the Plaintiffs had
> unsuccessfully attempted to obtain just compensation through the
> procedures provided by the state for obtaining such compensation
> would allow us to exercise jurisdiction over the Plaintiffs' claim.

383 F.3d at 574.[3]

Similarly, in Aaron v. Target Corp., 357 F.3d 768 (8th Cir. 2004), the court reversed the

district court's decision enjoining the City of St. Louis from proceeding with condemnation

proceedings in state court. The Eighth Circuit held that the district court should have abstained

when a state proceeding was pending or imminent, even when the owners sought to argue that

the taking was for a private, not public, use. The owners would have an adequate opportunity to

raise their constitutional challenge in state court:

> We conclude that the court erred in finding that the property
> owners did not have an adequate opportunity to raise their
> principal claim, that the taking is for a private use, in the state
> court eminent domain proceedings.
>
> Federal abstention in this case would permit Missouri's
> condemnation procedures to run their course. Eminent domain is
> an appropriate tool to help neighborhoods remain economically
> viable, attract industry, and encourage future growth. *See*
> *generally* Dolan v. City of Tigard, 512 U.S. 374, 114 S.Ct. 2309,
> 129 L. Ed. 2d 304 (1994); Thomas Merrill, *The Economics of*

---

[3]   The Seventh Circuit also rejected the landowners' argument that placing their properties on a list of
potential targets for eminent domain proceedings constituted a ripe claim. The Court held that it is only if
the owner was denied relief through a state inverse condemnation proceeding that a federal claim would
be stated. 383 F.3d at 574 (citing SGB Financial Services, Inc. v. Consolidated City of Indianapolis-
Marion County, 235 F.3d 1036 (7th Cir. 2000)).

*Public Use*, 72 Cornell L.Rev. 61 (1986).  Missouri has adequate judicial procedures for consideration of the parties' competing interests.  Land use policy is an area in which federalism principles are particularly strong as we recognized in <u>Night Clubs, Inc. [v. City of Fort Smith</u>, 163 F.3d 475, 479 (8th Cir. 2004].

357 F.3d at 778.

2.    <u>As lessees, Plaintiffs' alleged injury from a potential condemnation are too speculative</u>.

The Plaintiffs that are tenants or subtenants do not necessarily have a takings claim even if there were a taking of Plaintiffs' landlord's property pursuant to eminent domain.  Leases may well contain provisions that in the event of a taking of the landlord's property, the lease is terminated.  Such "condemnation clauses" have long been upheld to deny a tenant any entitlement to just compensation upon the taking of the landlord's property.  <u>See</u> <u>U.S. v. Petty Motor Co.</u>, 327 U.S. 372, 376 (1946) (when lease contains automatic termination clause on a taking of property for public use, "the tenant has no right which persists beyond the taking and can be entitled to nothing"); <u>cf</u> <u>Pennsylvania Avenue Development Corp. v. One Parcel of Land</u>, 494 F.Supp. 45, 50, 52 (D.D.C. 1980) (when parties to "lengthy, detailed, and sophisticated long-term commercial lease" agreed that upon termination of the lease "for any reason" the lessee's interest automatically vested in the lessor, the taking of the property by condemnation left the lessee with no compensable interest).[4]

The current question is not whether Plaintiffs ultimately have a compensable claim but whether a Complaint that assumes *both* that there will be a condemnation *and* that the Plaintiffs are entitled to some portion of an award is ripe for judicial action.  As of today, there has been no taking and no denial of just compensation, which is the threshold question under the

---

[4] By discussing just compensation which may be due, NCRC is not suggesting that a retail tenant is not entitled to relocation assistance or payments under the Federal Uniform Relocation Act, 42 U.S.C.A. § 4601 et seq. (2003).  NCRC will comply with all of its relocation obligations.

Constitution. Plaintiffs will have a full and fair opportunity to raise all of their claims, including any challenges to the authority for a taking, in the proceedings before the District of Columbia Superior Court if and when there is a taking of Plaintiffs' landlord's property pursuant to D.C. Official Code §16-1311, et seq.

**D.    The Skyland Act Is Constitutional.**

1.    Broad scope of governmental authority.

Plaintiffs' facial challenge to the constitutionality of the Skyland Legislation on the basis that it would allow for a taking of property in violation of the "public use" clause flies in the face of years of Supreme Court precedent, including the Court's latest pronouncement on the subject.

In Kelo v. City of New London, No. 04-108, 2005 WL 1469529 (U.S. June 23, 2005), the Court affirmed that economic revitalization was a valid public purpose for which the power of eminent domain could be exercised. In Kelo, the City of New London established a quasi-public economic development agency to implement a plan for revitalization of a part of the city. The city authorized the use of eminent domain to achieve its goal. Residential homeowners opposed the condemnation action (which was stayed by agreement pending resolution of the case) on the grounds that economic redevelopment was not a "public use" under the Fifth Amendment.

The Court first discussed the concept of "public purpose" and recognized that "[w]ithout exception, our cases have defined that concept broadly, reflecting our longstanding policy of deference to legislative judgments in this field." Slip op. at 10, 2005 WL 1469529 at *6. The Court cited and discussed Berman v. Parker, 348 U.S. 26 (1954), as well as Hawaii Housing Authority v. Midkiff, 467 U.S. 229 (1984), in support of its conclusion that "our public use jurisprudence has wisely eschewed rigid formulas and intrusive scrutiny in favor of affording

legislatures broad latitude in determining what public needs justify the use of the takings power."
Slip op. at 12-13, 2005 WL 1469529 at *7.

Recognizing that the City of New London was not dealing with the removal of blight, the
Court nevertheless found that the City's "determination that the area was sufficiently distressed to
justify a program of economic rejuvenation is entitled to our deference."  Slip op. at 13, 2005
WL 1469529 at *8.  The City's economic development plan "unquestionably serves a public
purpose" and a taking in furtherance of that plan did not violate the Fifth Amendment.  Id.  In
language equally applicable in rebuttal to the arguments raised by the plaintiffs here, the Court
wrote:

> [P]etitioners urge us to adopt a new bright-line rule that economic
> development does not qualify as a public use.  Putting aside the
> unpersuasive suggestion that the City's plan will provide only purely
> economic benefits, neither precedent nor logic supports petitioners'
> proposal.  Promoting economic development is a traditional and long
> accepted function of government. . . . Clearly, there is no basis for
> exempting economic development from our traditionally broad
> understanding of public purpose.

Slip op. at 13-15, 2005 WL 1469529 at *8.  The Court also rejected the argument that a taking
for purposes of economic development should be dependent on a showing that the expected
public benefits will actually accrue:  "Such a rule, however, would represent an even greater
departure from our precedent."  Slip op. at 17, 2005 WL 1469529 at *9.

2.    The public purposes in the Permanent Skyland Act.

Plaintiffs incorrectly allege that the Permanent Skyland Act is impermissibly vague as to
the purpose or use for which the Skyland Assemblage is to be acquired.  (Complaint ¶¶ 44, 46).

As in Kelo, the Skyland project is the result of a long and careful process of planning and
analysis.  The Skyland Act was enacted as a result of a legislative process which determined that
the area was blighted, that there were conditions of blight that should be alleviated, and that this

area of the District was lacking the retail amenities and job opportunities found elsewhere in the District and in neighboring Maryland. The Council has found that acquisition of the sites is "necessary and desirable for the public use" and will further many important public purposes, including removal of unsafe and unsanitary conditions, reduction of the incidence of crime, removal of garbage and other eyesores, and reorganization and reorientation of the site to make it safer and more attractive. See Exh. 1. The Council heard testimony about how the site conditions were contributing to crime and safety problems. Id. The Council also heard how the owners of the affected properties had been unresponsive for many years to the requests of the neighboring community to address the conditions. As the Council further found in enacting the companion legislation, the "Skyland Site Acquisition Support Act of 2004": "Skyland Shopping Center is in disrepair and contributes to blight in the Southeast Washington neighborhood, and would benefit from new retail improvements that will contribute to the creation of jobs, increase the availability of consumer goods and enhance economic development in the area."

The fact that the taken property will be transferred to a private owner does not diminish the public use aspect of the Skyland Project and Plaintiffs' contentions to the contrary lack support in the law. See Kelo, slip op. at 15-16, 2005 WL 1469529 at *8-9; Hawaii Housing, 467 U.S. at 243-44; Berman, 348 U.S. at 33-34.

It cannot reasonably be disputed that fostering economic growth, removing conditions of blight, alleviating conditions that contribute to crime and prevent revitalization are legitimate goals of the government and are well within the Supreme Court's jurisprudence regarding what is a "public use." Legislation was introduced and debated, hearings were held, and all sides of the issue were considered by the Council, not just once but several times. NCRC prepared and presented a comprehensive redevelopment plan, identifying the problems in layout, safety and

18

conditions in the current uses of the property and proposing a significant redevelopment. The neighbors, the affected community, have urged the District to take governmental action to alleviate the poor conditions and to arrest the further decay of the area. Plaintiffs may disagree with the legislative conclusion to proceed with redevelopment but that does not transform the obvious and important public use into a merely private use.

>    3.    The intention of the legislature as expressed in the preamble or the legislative findings embodied in a statute are accorded significant deference in construing the act.

Plaintiffs attack the facts found by the Council in enacting the Skyland Act. But traditionally, the intentions of the legislature as expressed in the preamble or the legislative findings embodied in a statute are accorded significant deference in construing an act. See, e.g., Association of American Railroads v. Surface Transportation Board, 237 F.3d 676, 680-81 (D.C.Cir. 2001) (remanding agency rulemaking because STB did not address or weigh the legislative preamble setting forth the government's stated policy); District of Columbia v. Beretta, U.S.A. Corp., 872 A.2d 633, 651 (D.C. 2005) (citing Council's legislative findings that certain classes of weapons have "little or no social benefit," court interprets District's law in light of its text, language, structure, and subject matter).

In Hornstein v. Barry, 560 A.2d 530, 533-34 (D.C. 1989), the District of Columbia Court of Appeals summarized a reviewing court's role:

>    Laws adjusting the burdens and benefits of economic life come to the courts with a presumption of constitutionality, and one complaining of a due process violation must establish that the legislature acted in an arbitrary and irrational way. *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 16, 96 S.Ct 2882, 2892, 49 L.Ed.2d 752 (1976). The elected branches have broad authority to determine the legislative facts on which a statute is based, and those challenging their judgment must convince the court that the legislative findings could not reasonably be conceived to be true by the governmental decisionmaker . . . .

> We emphasize that mere lip service to the presumption of constitutionality is insufficient, especially where, as in the present case, the legislation under attack addresses issues which are traditionally a proper subject for the exercise of the police power. Accordingly, the owners must make a very compelling showing indeed before this court may invalidate the [Rental Housing Conversion and Sale Act] without impermissibly encroaching upon legislative prerogatives.

Plaintiffs want to invert the normal presumption of constitutional validity of an enacted statute by claiming a due process violation in the legislative findings undergirding the decision to authorize the exercise of the power of eminent domain. Plaintiffs allege, specifically, that the Council's stated rationale for enacting the Permanent Skyland Act is pretextual and that the Council actually relied on facts not delineated in its legislative findings. Plaintiffs do not dispute that there was a legislative process, including public hearings. Plaintiffs are inviting the Court to do exactly what the federal courts have long refused to do, namely, substitute their judgment for the judgment of the legislature regarding the necessity or propriety of a particular condemnation decision. See Berman, 348 U.S. at 32 ("[s]ubject to specific constitutional limitations, when the legislature has spoken, the public interest has been declared in terms well-nigh conclusive. In such cases, the legislature, not the judiciary, is the main guardian of the public needs to be served by social legislation. . . . ").

4. The Due Process Clause does not require that a party affected by legislative action be afforded notice and an opportunity to be heard.

Plaintiffs further attack the constitutionality of the Skyland Act by stating that the Council's failure to conduct a public hearing on the revisions to the Permanent Skyland Act and to give Plaintiffs notice and an opportunity to object to the revisions is a violation of the Due Process Clause of the Fifth Amendment. (Complaint ¶ 50).

The Due Process Clause does not require that a party affected by legislative action be afforded notice and an opportunity to be heard. See, e.g., Pro-Eco, Inc. v. Board of

Commissioners of Jay County, Indiana, 57 F.3d 505 (7th Cir. 1995) (citing cases).  In Pro-Eco, a landowner complained that a moratorium against landfills was directed at the landowner and deprived it of property.  Even assuming that Pro-Eco had a property interest for purposes of analysis, the Seventh Circuit agreed that no Due Process Clause violation was shown:

> The Board is an elected body that acted legislatively in enacting the moratorium.  It did not deny Pro-Eco a permit or variance; rather it enacted a generally applicable ordinance.  Governing bodies may enact generally applicable laws, that is, they may legislate, without affording affected parties so much as notice and an opportunity to be heard.  *Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445, 36 S.Ct. 141, 142, 60 L.Ed. 372 (1915).  "The fact that a statute (or statute-like regulation) applies across the board provides a substitute safeguard."  *Philly's v. Byrne*, 732 F.2d 87, 92 (7th Cir. 1984)(citing *United States v. Florida East Coast Ry.*, 410 U.S. 224, 245-46, 93 S.Ct. 810, 821, 35 L.Ed.2d 2123 (1973)).

57 F.3d at 513.  See also 37712, Inc. v. Ohio Dept. of Liquor Control, 113 F.3d 614, 619 (6th Cir. 1997) (notice and opportunity to be heard not required under Due Process Clause prior to legislative action); Reel Pipe & Valve Co., Inc. v. Consolidated City of Indianapolis-Marion County, 633 N.E.2d 274, 278 (Ind. Ct. App. 1994) ("a property owner has no constitutionally protected right to participate in a legislative decision which may or may not lead to future eminent domain proceedings").[5]  Because the District was not obligated to afford the Plaintiffs notice and an opportunity to be heard, the Complaint does not state a violation of the Due Process Clause.

---

[5]     It has been held that the Due Process Clause does not require prior notice or opportunity to be heard before the Government exercises its eminent domain power.  See, e.g., United States v. 131.68 Acres of Land, 695 F.2d 872, 876 (5th Cir. 1983).  That being so, it is difficult to see how a landowner would have a constitutional right to notice and opportunity to be heard prior to enactment of legislation authorizing such a taking.

**E.**     **No Violation of the D.C. Home Rule Act.**

1.     <u>The Council's action is given substantial deference.</u>

Plaintiffs question whether an emergency existed at the time that the Council enacted the emergency Skyland Act which expired last Fall.  Not only is the issue mooted by the expiration of the emergency Act and the subsequent enactment of permanent legislation, but Plaintiffs' complaint asks this Court to second-guess a legislative determination that is entitled to substantial deference.

Under the Home Rule Act, <u>D.C. Official Code</u> §1-204.12(a), the Council is authorized to enact emergency legislation upon a two-thirds vote for a duration of not longer than 90 days and without the Congressional review required for permanent legislation.  The D.C. Court of Appeals has construed this delegation of legislative authority broadly.  <u>See</u> <u>Atchison v. District of Columbia</u>, 585 A.2d 150, 156-7 (D.C. 1991) (stating "Congress' delegation to the Council of the required determination calls for substantial deference to the Council's definition and determination of 'emergency circumstances', a deference that is not likely to erode congressional prerogatives because, very simply, emergency circumstances by definition cannot last very long. Therefore, in looking at a legislatively declared emergency, we seek only to assure ourselves that the act is facially valid, i.e. consistent with Council legislative authority in partnership with Congress").

In <u>Atchison</u>, the Council passed emergency legislation regarding rights to shelter and housing assistance to homeless persons.  The <u>Atchison</u> plaintiffs – like Plaintiffs here (see Complaint ¶ 72) – challenged the Council's determination that a genuine emergency existed and alleged that "the emergency legislation in effect was a dodge to avoid the more onerous procedural requirements for enacting permanent legislation."  <u>See</u> 585 A.2d at 153.  The

22

Atchison plaintiffs further argued that no emergency existed since the permanent legislation to repeal the Shelter Act was introduced 16 months before the declaration of an emergency and the sponsors announced their intention to pass it as an "emergency" act a full 100 days before the Council fully did so. See id. at 156; cf. Complaint ¶ 69-70.

In affirming the Superior Court's denial of plaintiffs' requested declaratory judgment, the Court of Appeals held that "whatever further definition may be given the substantial deference we owe the Council's determination that an emergency exists, we conclude that the Council's finding in this case must be sustained." 585 A.2d at 157. The court noted that "whether the permanent law could have been passed within the duration of the emergency act or the Council delayed in passing the permanent or the emergency act is insufficient to invalidate the Council's judgment that immediate action was necessary." Id. at 157. The court further clarified that "whether or not this crisis could have been foreseen, and however traceable it may be—as appellants assert—to a lack of political will to act earlier by passing permanent legislation, the Council's inaction cannot nullify a need which it perceived to be acute in view of the magnitude by which expenditures were outstripping appropriations." Id. at 157.

As in Atchison, this Court must give substantial deference to the Council's determination that an emergency existed and that the Skyland legislation needed to take effect immediately – especially since the Council passed the emergency legislation at the same time as it had introduced temporary and permanent legislation. In light of the substantial deference given to the Council's determination that an emergency existed and the facts surrounding the enactment of the emergency legislation, this court must dismiss Plaintiffs claim that no emergency existed.[6]

---

[6] Although not necessary for disposition of the motion to dismiss, it should be noted that the legislative record at the public hearing regarding the emergency act demonstrated that the District and NCRC were poised to have significant discussions with potential retailers shortly after adoption of the emergency legislation. Adoption of the emergency legislation demonstrated the Council's commitment to

2.    <u>The Council is not prohibited from adopting consecutive emergency acts.</u>

Plaintiffs contend that the Council also violated Section 1-204.12 of the Home Rule Act by enacting more than one identical emergency measure based on the same emergency circumstances. (Complaint ¶ 61). Plaintiffs' argument again misses the mark. The Home Rule Act does not proscribe enacting consecutive emergency legislation for substantially identical emergencies. <u>See</u> <u>United States v. Alston</u>, 580 A.2d 587, 597 (D.C. 1990) (holding that upon review of the plain language of the Home Rule Act and its legislative history, the court finds no basis on which to hold that the Council abused its authority by enacting consecutive emergency legislation for substantially identical emergencies).

Here, the Council introduced emergency and temporary Skyland legislation on March 4, 2004 – a day after the Permanent Skyland Act was introduced. (Complaint ¶ 15-18). While the temporary legislation was pending Congressional review and approval, the Council introduced the second emergency Skyland legislation on July 12, 2004, which was substantially identical to the first. (<u>Id.</u> at 19). The first emergency legislation expired on August 19, 2004 (<u>id.</u> at 17) while the temporary Skyland legislation did not take effect until September 30, 2004. (<u>Id.</u> at 18) The Council's enactment of the second emergency legislation, which took effect on August 2, 2004 and expired on October 31, 2004 (<u>id.</u> at 19), bridged the gap between the first emergency and temporary legislations and  was necessary to maintain the status quo.

Under substantially similar circumstances, the <u>Alston</u> Court held that consecutive emergency legislation is within the Council's authority.

> Where the Council has determined that emergency legislation should remain in effect for more than ninety days and taken all reasonable actions to assure that its legislation, in a form enacted after two readings, is presented to Congress for review without

---

Skyland and to the use of eminent domain if necessary which was critical to the question of whether site control could be achieved.

unreasonable delay, the Council acts within its legislative authority under the Home Rule Act when it enacts a successive substantially similar emergency act in order to maintain the status quo during the congressional review period. Hence the Second Emergency Act is a valid enactment.

3.    NCRC had the authority to enter contracts before enactment of the emergency and temporary legislations.

The reason Plaintiffs focus on the now-expired emergency Skyland acts is because they want to argue that NCRC's actions during the existence of that legislation were ultra vires. But since no eminent domain power was exercised during the lifetime of the emergency or temporary legislations, Plaintiffs' claims fail, regardless of the validity of the legislation.

Plaintiffs are flatly incorrect that "but for the First and Second Skyland Emergency Acts and the Temporary Act,[] there was no statutory authority for defendant NCRC to take any actions or expend or commit any funds concerning the Skyland Project or the Skyland Assemblage during the period beginning May 21, 2004 through April 5, 2005." (Complaint ¶¶ 62, 73). The emergency and temporary legislations only sought to delineate NCRC's authority to acquire the Skyland Assemblage by condemnation. The Skyland legislations did not cloak NCRC with the authority to negotiate and contract with persons or entities. Since its creation, NCRC has had the power to "lease, purchase, or acquire, own hold, or manage, clear, repair, improve, construct, or deal in connection with any property (real, personal, or mixed), or any interest therein, wherever situated." See D.C. Official Code § 2-1219.15(15) (2001). Further, NCRC has had the power to "make and perform contracts, agreements, and commitments for assistance." Id. at § 2-1219.15(18). All of NCRC's actions – including contracting with an appraiser to appraise plaintiffs' property and that of other Skyland Assemblage property owners – were obviously valid actions irrespective of the emergency and temporary legislation and pursuant to its enabling statute.

**F.  The DCEPA Has Not Been Triggered.**

Plaintiffs' final contention is that Defendants are required pursuant to the D.C. Environmental Protection Act to prepare and file an Environmental Impact Statement "before any actions including the acquisition of plaintiffs' Property or of any other property in the Skyland Assemblage may proceed." This argument is also without legal support.

The DCEPA states in relevant part that whenever "the Mayor or a board, commission, authority, or person proposes or approves a major action that is likely to have substantial negative impact on the environment, if implemented, the Mayor, board, commission, authority, or person shall prepare or cause to be prepared, and transmit, in accordance with subsection (b) of this section, a detailed EIS <u>at least 60 days prior to implementation of the proposed major action</u>, unless the Mayor determines that the proposed major action has been or is subject to the functional equivalent of an EIS." (Emphasis added).  <u>D.C. Official Code</u> § 8-109.03(a) (2001). A major action is "any action that costs over $1,000,000 and that may have a significant impact on the environment...." <u>See</u> <u>id.</u> at § 8-109.02(1).  "A significant impact on the environment" includes any action that might disrupt or divide the physical arrangement of an existing community or one that might cause significant adverse change in the existing level of noise in the vicinity of the action."  <u>See</u> <u>Foggy Bottom Ass'n v. District of Columbia Board of Zoning Adjustment</u>, 791 A.2d 64, 72 n.18 (D.C. 2002).  The key requirement [of the DCEPA] is that the EIS review occur before the major action is actually "implemented." <u>Id.</u> at 73.

While it is questionable that NCRC's proposed plans of converting the Skyland Assemblage into a new shopping center would have a "significant impact on the environment" and therefore constitute a major action within the meaning of the statute, <u>see</u> <u>id.</u> at 72 (noting that construction of hospital would not violate any environmental standard), it is clear that

implementation of the Skyland Project has not yet occurred to trigger the EIS requirement. Implementation does not occur at acquisition of a property but upon commencement of construction. Id (noting that "before any implementation of the hospital project" means "before construction actually began"). In Foggy Bottom Ass'n challengers to a proposed construction of a university hospital sought review of the Board of Zoning Adjustment's ("BZA's") grant of a special exception to George Washington University alleging that the BZA should have withheld its granting of the special exception until GW's proposal underwent EIS review. See Foggy Bottom Ass'n, 791 A.2d at 72. The court, in holding the BZA's decision to grant a special exception before an EIS review as "at worst harmless," noted that "under the DCEPA, the environment can be harmed only if a proposed major action violates environmental standards *and* the major action is 'implemented,' i.e., before construction began." See id. at 73.

Plaintiffs offer no facts showing that NCRC will have control of the Skyland Assemblage and will begin implementation, i.e., demolition and construction of the Skyland Project within 60 days. As Plaintiffs have stated, NCRC has contracted to acquire only 30% of the Skyland Assemblage and has not closed on said purchases as yet. (Complaint ¶ 79). From the foregoing, Defendants' preparatory actions cannot be deemed "implementation" of a major action that would trigger the EIS requirement. Under no set of facts can Plaintiffs demonstrate that Defendants have violated the DCEPA.

III.    **CONCLUSION**

Defendants respectfully request that the Court dismiss Plaintiffs' Complaint pursuant to Rules 12(b)(1) and 12(b)(6).  Plaintiffs' case is not ripe and, on the merits, the Complaint fails to state a claim upon which the Court can grant relief.

Respectfully submitted,

ROBERT J. SPAGNOLETTI
Attorney General for the District of Columbia

CHARLES F. BARBERA
Deputy Attorney General, Commercial Division

/s/

DAVID FISHER (D.C. Bar # 325274)
Chief, Tax, Bankruptcy, and Finance Section

/s/

RICHARD G. AMATO  (D.C. Bar # 21618)
richard.amato@dc.gov
Assistant Attorney General
441 4th Street, N.W., Sixth Floor North
Washington, D.C.  20001
 (202) 724-7751
 (202) 727-6014 (fax)

HOLLAND & KNIGHT LLP

Paul J. Kiernan (D.C. Bar # 385627)
paul.kiernan@hklaw.com
2099 Pennsylvania Avenue, N.W.
Suite 100
Washington, D.C. 20006
(202) 955-3000 – phone
(202) 955-5564 – fax

# 2985846_v3