UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SAMUEL FRANCO, et. al.,                   :
                              Plaintiffs  :      Civil No. 1:05-CV-01058 (RMU)
            v.                            :
                                          :
THE DISTRICT OF COLUMBIA, et. al.,        :      ORAL HEARING REQUESTED
                              Defendants. :

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
AMENDED COMPLAINT

Plaintiffs, Samuel Franco, Nathan Franco, Allen Franco and D Mart, Inc., by their

attorney herein, submit this memorandum of points and authorities in opposition to the motion of

defendants District of Columbia ("District"), National Capital Revitalization Corporation

("NCRC") and RLA Revitalization Corporation ("RLA") to dismiss the first amended

complaint[1].

INTRODUCTION

This is an important case testing the Takings Clause of the Fifth Amendment of the U.S.

Constitution.  The principal issue in this case is whether a District of Columbia government

entity, lacking authority to acquire such property by eminent domain, can (1) first contract with a

private developer to acquire a privately owned and operating shopping center that is not slum or

blighted and sell it to the developer for redevelopment for his own benefit with the government

entity sharing in the revenues from the completed development project on a continuing basis,

and (2) then have the District government pass legislation enabling the government entity to

condemn the shopping center solely to enable the entity to perform its agreement with the

_____

[1]In their memorandum , defendants incorrectly refer to the first amended complaint as the "Second
Amended Complaint".  In this memorandum, defined terms have the same meaning given in the first amended
complaint unless otherwise provided herein.

redeveloper and share in the project's financial benefits.  Plaintiffs claim in their first amended complaint that such legislation amounts to an impermissible taking of their property for a private use, and not for a public use, and that the D.C. Council's belated and pretextual legislative attempts to justify such a taking on the basis of blight are unavailing.  In the circumstances of this case, under established court precedents, the Council's actions are not entitled to judicial deference, but are subject to careful and heightened judicial scrutiny.

This action is one of three actions related to the proposed taking by eminent domain of the Skyland Shopping Center in Southeast Washington, D.C. by defendant NCRC that are pending before this Court.  This action is different from each of the other two pending actions, and is especially different from Rumber v. The District of Columbia, et. al., Civil No. 1:04-cv-01170 (RMU), in significant respects.  Unlike Rumber, the first of the other related cases filed, the claims alleged in the complaint and first amended complaint in this action that defendants have violated plaintiffs' constitutional rights under the Fifth Amendment Takings Clause focus on the transactions between defendant NCRC and the Redeveloper it chose in 2002 to redevelop the Skyland Assemblage and the relationship of those transactions to the Skyland Legislation enacted by the Council two years later in 2004. The plaintiffs in Rumber raise a number of constitutional claims in their third amended complaint, but none of their claims address the connection between the pre-selection of the redeveloper by NCRC and the real purpose of the Skyland Legislation which was to confer a benefit on a private party, the Redeveloper, by facilitating the transfer of the Skyland Assemblage to the Redeveloper to be redeveloped for his own primary benefit.  In the instant case, plaintiffs state the facts of such claim, which, if proved, would constitute the taking of their property for a non-public use or purpose.

In the second of the related actions, <u>Autozone Development Corporation v. The District of Columbia</u>, et. al., Civil No. 1:05-cv-00476 (RMU), plaintiffs, a commercial tenant and sub-tenant of property in the Skyland Center, assert Fifth Amendment Takings Clause and Due Process Clause claims similar to the constitutional claims brought by plaintiffs here.  In <u>Autozone</u>,  plaintiffs, seeking to enjoin the sale of the property they lease, by their landlord, the owner, to defendant NCRC, sue the property owner and the Redeveloper in addition to defendants D.C. and NCRC.  None of the <u>Autozone</u> claims regarding the sale of the property by the owner to NCRC are present or raised by the plaintiffs in the instant action.  None of the parties or their counsel in any of the three related cases are related to the parties or counsel in the other related cases.[2]

As stated in plaintiffs' opposition to defendants' motion to dismiss the complaint (Doc. # 11, at 2), the complaint was amended in several respects: (1) the first amended complaint contains new factual allegations and claims that the Skyland Legislation violates the Fifth Amendment Takings Clause in that it authorizes the taking of the Skyland Assemblage for a private use in a manner that the Supreme Court in <u>Kelo</u> said was impermissible.  See, especially, Count I.  (2) In addition, Count III of the complaint was amended and is now Count IV of the first amended complaint, and claim that the Council's failure to conduct a public a hearing on and afford the public an opportunity to comment on the amendments of B15-752, the Skyland Permanent Act, before its enactment were violations of District of Columbia law and the Council's Rules, and (3) Count VII alleging a violation of the District of Columbia environmental statute was deleted.

---

[2]Plaintiff Samuel Franco was erroneously included as a plaintiff in the original complaint in <u>Rumber</u> without his knowledge or permission.  Upon learning of that error, he promptly caused the plaintiffs in <u>Rumber</u> to amend their complaint and delete him as a party.

Defendants do not address Count IV of the first amended complaint in their motion, and, thus, it is presumed that they concede it states a claim.

Plaintiffs also incorporate herein by reference their memorandum of points and authorities in opposition to defendants' motion to dismiss the complaint, and request that the Court consider it together with this memorandum in opposition the defendants' motion to dismiss the first amended complaint.

Plaintiffs note that defendants similarly have incorporated their memorandum in support of their motion to dismiss the complaint for consideration on this motion. (Defendants' memorandum, at 2). Plaintiffs object to defendants references to alleged factual matters outside the complaint or the first amended complaint to the extent that defendants' motion to dismiss the complaint or this first amended complaint is brought under Rule 12(b)(6) and not under Rule 12 (b)(1). See Lockamy v. Truesdale, 182 F. Supp. 2d 26, 30 (D.D.C. 2002). For example, defendants' statements regarding the Council's legislative proceedings and actions by NCRC and the community in connection with them on pp. 17-19 of Defendants' memorandum in support of their motion to dismiss the complaint are not drawn from the complaint or the amended complaint, are disputed by plaintiffs, and should be disregarded.

<u>ARGUMENT</u>

1.    <u>This Court should not abstain in this action, because defendant Samuel Franco has removed the D.C. Superior Court condemnation action filed against him to the United States District Court for the District of Columbia. The two actions should be consolidated.</u>

On August 11, 2005, plaintiff Franco, as defendant Samuel N. Franco, removed to the United States District Court for the District of Columbia the condemnation action brought

against him by defendant NCRC as plaintiff referred to in Defendants' memorandum, at 2.[3]  The removed action bears case no. 1:05-cv-01603 (RMU).  Accordingly, defendant Franco submits that the Court should withhold any action on defendants' request in their motion for abstention pending the outcome of the removal proceeding.  And if that action is not remanded, the Court should deny the request for abstention as being moot, and consolidate the actions pursuant to Rule 42.

2.     Count I of the first amended complaint states a claim that the Skyland Legislation authorizes a taking of plaintiffs' property for a non-public use or purpose in violation of the Takings Clause of the Fifth Amendment of the U.S. Constitution.

In their memorandum, at 5, defendants state "(e)veryone concedes that a one-to-one transfer of property from one owner to another for the purpose of advancing the private interests of the transferee is impermissible", citing Kelo, 125 S.Ct. 2655, 2661 (2005).  But, then defendants proceed to argue that the allegations in the first amended complaint "belie the argument that that is what has occurred at Skyland".  Id.  In support of their argument, defendants purposefully select a few allegations of the first amended complaint, but disregard and omit the balance of the material allegations of the amended complaint that make the claim that the taking is a non-public unconstitutional taking under the dicta in Kelo.

The first amended complaint states, in summary, that in response to political demands by community activists for an improved Skyland Center containing certain new retail facilities, NCRC became interested in and sought out and contracted with a private developer to redevelop the Center.  In 2002, NCRC entered into a joint development agreement with the Redeveloper (the "JDA") covering the essential terms of the transaction, including, among other things, that

---

[3]On August 8, 2005, prior to filing his notice of removal to this Court, Franco as defendant filed an answer and counterclaim to the amended complaint in the Superior Court condemnation action.

(a) that the parties would agree upon the purchase price, (b) NCRC, which did not then have such authority, would obtain authority from the D.C. Council to exercise eminent domain to acquire and convey the Skyland Center and some adjacent undeveloped land to the redeveloper, and ©) the developer would redevelop and own the property for his own benefit and share, on a continuing basis, the operating cash flow and capital proceeds from the project with NCRC.

Two years later, in 2004, NCRC in league with the District government and with help from its pre-selected Redeveloper, sought authorizing Council legislation to enable it to acquire the property by eminent domain.  The Council, like the rest of the District government, responded affirmatively to NCRC and cooperated with NCRC by adopting such legislation for the purpose of enabling NCRC to perform its undertaking to sell the Skyland Center to the Redeveloper.  Neither NCRC nor the District prepared any plans for the redevelopment of the Skyland Center or the surrounding area to guide the Council in deciding whether to adopt the Skyland Legislation.  The only plans prepared for the Skyland Center and submitted to the Council were those developed by the Redeveloper, the ultimate purchaser, for redevelopment of the property.

The legislation (the "Skyland Legislation") was adopted by the Council in a succession of emergency, temporary, and permanent acts, designed to enable NCRC to start the acquisition process even before it had the necessary permanent authority and funding to do so.  The legislation, initially, consisted of a skeletal provision amending the NCRC Act to give NCRC the bare right to condemn the property and declaring it to be necessary and desirable for the public use, but not declaring the use or purpose for which it was to be taken.

However, after the <u>Rumber</u> case was commenced and after the U.S. Supreme Court granted certiorari in <u>Kelo v. City of New London</u>, No. 04-108 in September, 2004, the Council

committee handling the pending permanent bill, quietly and without public notice or hearing inserted certain legislative findings including findings of blight in the bill six months after the public hearing on it.  Until then no findings of blight had ever been made concerning the Skyland Center by any of the defendants, and the Skyland Center in fact was not blighted.   The Council committee made those findings because the defendants feared that the Skyland Legislation then enacted (the emergency and temporary acts) and the permanent act then pending might not be constitutional particularly if the Supreme Court reversed the state court decision in Kelo.

If those fears were realized, the government's primary purpose in enacting the legislation - acquiring the property and conveying it to the Redeveloper - would be frustrated.  Thus, the Council committee quietly amended the bill in an attempt to avoid that problem, and the Council promptly enacted it.

From the time it selected the Redeveloper in 2002 onward, NCRC worked with its chosen instrument, the Redeveloper, to perform its JDA undertakings, and would not negotiate with any of the Skyland owners who sought to do so.  NCRC focused on getting the Skyland Legislation passed so it could assemble the property and convey it to the Redeveloper.  For its part, the District gave wholehearted cooperation and aid to NCRC's Skyland project.  The Redeveloper gave its support to the proposed legislation.  The Council similarly cooperated with NCRC in all its Skyland legislative actions, and accepted and rubber stamped NCRC's submissions virtually without question.  By its actions, the Council revealed its true, and illegitimate, purpose which was to convey a benefit on a private party, which, of course, was also NCRC's objective.

The following are the allegations of the first amended complaint that address and comprise this claim.

7

a. Prior to 2002, NCRC became interested in redeveloping the Skyland Center in response to community activists who wanted an improved Skyland Center containing such facilities as a Starbucks coffee shop, a book store and a table cloth restaurant.  (Para. 17).

b. NCRC then solicited proposals for private developers to redevelop the Skyland Center, together with five acres of adjacent land deemed necessary to make redevelopment feasible (collectively the Skyland Assemblage).  (Paras. 13, 18)  In soliciting such proposals, NCRC didn't prepare any comprehensive plans for the area or for the Skyland Center, but instead required that the interested developer prepare and submit its own plans for redeveloping the Skyland Center as part of its application. (Para. 18)

c. In May, 2002, NCRC selected the Redeveloper to redevelop the Skyland Assemblage, and entered into a joint development agreement with the Redeveloper in September, 2002. (the "JDA")  (Paras. 6, 19).

d. The JDA apportioned responsibilities between the Redeveloper and NCRC, giving the Redeveloper responsibility for planning, financing and carrying out the demolition of the existing center and its redevelopment, and NCRC the responsibility of assembling the Skyland Assemblage, displacing the existing occupants and selling the property to the Redeveloper at an agreed price.  The JDA also committed the Redeveloper to share the operating cash flow and capital proceeds from the completed project with NCRC. (Paras. 20, 21)

e. NCRC's primary if not sole object in gaining passage of the Skyland Legislation and carrying out the acquisition of the Skyland Assemblage was to perform its undertaking to the Redeveloper under the JDA. (Paras. 7, 13)

f. D.C.'s actual and non-pretextual purpose in passing the Skyland Legislation was to confer a benefit on a private party, the Redeveloper, in a one-to-one transaction, with NCRC sharing in the financial benefits of the privately redeveloped and owned project (Para. 55).

g. NCRC did not then have authority to acquire the Skyland Assemblage by eminent domain (Para. 24), and the JDA required NCRC to seek and obtain such eminent domain authority from the Council in order to condemn those properties that it could not acquire by negotiation. (Para 20).

h. The JDA required that closing on the sale from NCRC to the Redeveloper occur by July, 2004. (Para. 21).

I. Accordingly, in order to fulfill its undertakings to the Redeveloper, NCRC initiated the Skyland Legislation process whereby the permanent legislation was introduced in March, 2004, emergency measures were passed in April and August, 2004 and a temporary measure was enacted in June, 2004 (Paras.13, 24, 25, 27-29).

j. NCRC and the District conspired in the scheduling and enacting of the Skyland Legislation to enable NCRC to start assembling the Skyland Assemblage even though it didn't have permanent legislation authorizing it to do so or the funding to do so. (Paras. 30, 34, 39).

k. The Redeveloper agreed in the 2002 JDA to obtain a lease from an anchor non-grocery tenant of at least 50,000 sq. ft. (Para. 20), and NCRC assured the Council in 2004 it would not start eminent domain proceedings without such a commitment from a major non-grocery retailer. (Para. 26).  In May, 2005, NCRC admitted it still did not have such a commitment, and lacked the funds to acquire the Skyland Assemblage. (Para. 46)  Notwithstanding the foregoing, in April, 2005, NCRC threatened to commence eminent domain proceedings by May 31, 2005

unless plaintiff Samuel Franco and the other Skyland owners agreed to sell their properties to NCRC or join in a redevelopment venture with NCRC. (Para. 46).

l. After selecting the Redeveloper in 2002, NCRC failed and refused to negotiate with the Skyland owners regarding redevelopment of the Skyland Assemblage (Para. 49). NCRC told the Skyland owners in May and June, 2005 that any redevelopment of the Skyland Assemblage by the Skyland owners must include NCRC and the Redeveloper, even though ever since July 1, 2004, NCRC and the Redeveloper were either not legally committed to each other or could terminate their relationship. (Paras. 49, 50).

m. Neither the JDA nor the Skyland Project was contingent on the existence or finding of slums or blight in the area. (Para. 23), and the Skyland Legislation did not contain any findings of slum or blight or any basis for declaring the Skyland Assemblage necessary or desirable for the public use prior to the amendment of the pending permanent act in October or November, 2004, 6 months after the public hearing on the measure and after the U.S. Supreme Court granted certiorari in Kelo. (Paras. 25, 27-29, 31).

n. Neither the Skyland Assemblage nor the surrounding neighborhood was blighted, and NCRC and the District knew that such area was not blighted and that NCRC lacked the authority to take such property by eminent domain. Accordingly, they conspired to have the Council insert legislative findings of blight in the pending Skyland permanent act in an attempt to make such legislation constitutional. (Paras. 12, 13, 34-37, 56-57)

o. However, such findings were pretextual, false and unfounded, and the Council adopted them pretextually in a wrongful attempt to justify NCRC's taking of the Skyland Assemblage as public use and selling it to the Redeveloper in fulfillment of the JDA. (Paras. 35-38, 57).

10

p. NCRC and the Council delayed its adoption of the permanent act to the last possible date in order to enable further amendments if desired and to suppress critical review by the public. (Paras. 39, 88)

q. At no relevant time did NCRC, the District or any other public agency make any slum or blight findings, or plans to remedy or eliminate such conditions in the Skyland Assemblage. (Para. 40)

r. The Redeveloper testified in support of the Skyland Legislation as it was being considered. (Para. 43).

s. The JDA provided that NCRC would share in the Redeveloper's operating cash flow and capital proceeds from the Skyland Project. (Para. 20)

t. The actual non-pretextual purpose of the Skyland Legislation is to confer a benefit on a private party by allowing the Redeveloper to acquire private property over other private parties' objections to redevelop it for its own private benefit with NCRC sharing in certain financial and other benefits of the private undertaking (Para. 55).

u. As such, the Skyland Legislation authorized taking is a purely private one-to-one transfer with NCRC acting as a surrogate for the Skyland Assemblage owners as sellers, acquiring it through eminent domain and selling to the Redeveloper for his own benefit. (Para. 54).

v. In NCRC's and the Council's actions in enacting the Skyland Legislation, plaintiffs' rights under 42 U.S.C. §1983 are violated and their rights under the Takings Clause of the Fifth Amendment threatened. (Para. 58).

Under Rule 12(b)(6) the first amended complaint should not be dismissed unless it is clear that no relief could be granted under any set of facts that could be proved consistent with

the allegations. <u>Lockamy v. Truesdale</u>, 182 F. Supp.2d at 31. "Moreover, the Court should draw all reasonable inferences in the non-movant's favor." *id.* Further, an action, especially one, such as this, brought pursuant to 42 U.S.C. §1983 should not be dismissed at the pleading stage unless it appears to a certainty that no relief can be granted to the plaintiff under any state of facts which might be proved in support of his claims. See <u>U.S. General, Inc. v. Schroeder</u>, 400 F. Supp. 713 (D. Wisc. 713).

The reasonable inferences that should be drawn from count I of the first amended complaint are the following:

(I) Some time in or before 2002, the Skyland Project was initiated by defendants NCRC and D.C. to satisfy demands of vocal Hillcrest community activists to improve the Skyland Shopping Center,

(ii) Without determining the needs for public action in the area and without doing any planning for the site or the larger area and without having either legal authority or funds to undertake the project, NCRC solicited proposals from developers to redevelop the Skyland Assemblage, which included not only the Skyland Shopping Center, but an adjacent 5 acre tract of undeveloped land deemed necessary to provide sufficient parking for the redeveloped center.

(iii) NCRC required the developers to prepare and submit their own plans of how they would redevelop the site, and, in May, 2002, NCRC selected the Redeveloper and the plan it submitted, which included a proposed "big box" non-grocery anchor tenant, such as a Target department store.

(iv) NCRC and the Redeveloper entered into the JDA which committed the Redeveloper to further refine his plans and to demolish and to redevelop the property with a new shopping center in accordance with his proposal containing at least one major non-grocery anchor tenant.

The Redeveloper would bear all the costs of planning, demolition and construction, but the purchase price would negotiated by the parties and would contain a sufficient write down to make the project feasible for the Redeveloper.

(v) Although the project would be owned and operated by the Redeveloper for his own benefit, NCRC would have a permanent beneficial interest in the project by sharing, on a continuing basis, in the operating cash flow and capital proceeds from the completed development.

(vi) The JDA obligated NCRC to get eminent domain authority from the Council to acquire the site, which it did not then have.  Since NCRC and D.C. knew the area was not blighted and wasn't eligible to be taken under existing law, they caused the Council first to pass legislation simply declaring the property to be necessary and desirable for the public use, and to authorize NCRC to acquire it by condemnation without specifying any use.

(vii) The Council, only too happy to satisfy NCRC's requirements and the demands of the vocal Hillcrest community activists, willingly cooperated, and rubber stamped the legislation proposed by NCRC, first on an emergency basis to enable NCRC to commence the work it had to do to acquire and sell the site to the Redeveloper by July 1, 2004, even before NCRC had the necessary funds or permanent authority.  Out of an abundance of caution, NCRC and D.C. decided to delay enactment of the permanent legislation to the latest possible date so as to be able to make any changes that may be needed before passage.  After the U.S. Supreme Court granted certiorari in Kelo in September, 2004, defendants realized the Skyland legislation might not pass constitutional muster, and decided to add legislative findings, including findings of blight, to make the Skyland taking defensible under Berman v. Parker, 348 U.S. 26 (1954) or under the anticipated Kelo decision.  They did this pretextually, knowing that the site was not

blighted and that the only reason for their findings was to enable NCRC to complete its deal with the Redeveloper.

(viii) The Redeveloper was a visible and active participant in the legislative process.

(ix) The Council never prepared, reviewed or approved any plans for the needs, betterment or the redevelopment of the Skyland site, the surrounding area or the greater Anacostia area in connection with the Skyland project, except the Redeveloper's specific development plans for the Skyland Project. The Council simply enacted the Skyland legislation to enable NCRC to condemn the property over the objections of the Skyland owners, and sell it to its chosen instrument, the Redeveloper for his own benefit.

(x) In this way the Council's purpose was illegitimate and it acted pretextually in enacting the Skyland Legislation not for the public use or for a public purpose but to confer a private benefit on the Redeveloper with financial rewards and participation flowing back to NCRC. This is the typo of transaction to which the courts give careful and heightened scrutiny. See Kelo v. City of New London, 125 S. Ct. 2655, 26677, and n. 17 (2005).

Plaintiffs respectfully submit that the Court's memorandum opinion filed July 19, 2005 in Rumber (Doc. #44) is not applicable to this motion. The Court's decision in Rumber denying plaintiffs' second motion for a preliminary injunction invoked the more stringent standards for granting such motions. Here, at this very early pleadings stage, findings of probability of success on the merits of the claim are not relevant or warranted.

Further, plaintiffs submit that the Court's statement in its Rumber opinion that "...the one-to-one transfer admonished in Kelo is not present in this case" (Doc.#44, at 7) should be limited to Rumber and the facts alleged by the plaintiffs in that case. The Court made clear in its Rumber opinion that its statement was in response to the Rumber plaintiffs' argument that the

14

taking is unlawful because private parties are being used to accomplish the taking and revitalization. *id.* As noted in this memorandum, *supra.* at 2, the <u>Rumber</u> complaint and amended complaints do not address the critical relationships between NCRC, the Redeveloper and D.C., and the Redeveloper's relationship to the Skyland Legislation and are significantly different from the complaint and first amended complaint in this action.

As described above in this memorandum, at 5-11, the first amended complaint clearly alleges a taking for a private transaction of a one-to-one nature between NCRC and the Redeveloper constituting a private use impermissibly authorized by the Council. In any event, at this pleading stage of the instant case, plaintiffs are entitled to and should be afforded an opportunity to prove their claims. The first amended complaint should not be dismissed, especially not on those <u>Rumber</u> grounds, on defendants' motion.

The U.S. Supreme Court decision in <u>Kelo</u> is instructive in this case because of its dicta, in which the Court described the rules applied by courts to determine whether a particular taking was for a public use. See <u>Kelo</u>, 125 S. Ct. at 2661-62. As the Supreme Court stated, "(i)t has long been accepted that the sovereign may not take the property of A for the sole purpose of transferring it to another private party B, even though A is paid just compensation." *id.* But, that is precisely what the first amended complaint alleges. The abovementioned paragraphs allege the facts in sufficient detail to apprise the Court and the defendants of such claims and in paragraph 54, plaintiffs allege "the taking of the Skyland Assemblage would be an assemblage of the Skyland Assemblage for redevelopment by the Redeveloper, a private entity, in a purely private one to one transaction with another private part with defendants NCRC or RLA acting as the surrogate for the private party owner-sellers through the use of defendants' eminent domain authority."

15

Further, the Supreme Court stated on the same subject, "the City would no doubt be forbidden from taking petitioners' land for the purpose of conferring a private benefit on a particular private party.  See Midkiff, 467 U.S. at 245 ('A purely private taking could not withstand the scrutiny of the public use requirement; it would serve no legitimate purpose of government and would thus be void')" 125 S. Ct. at 2661.  Again, the above mentioned paragraphs of the first amended complaint allege the  facts constituting such claim in sufficient detail, and, using the language of Kelo, paragraph 55 states the claim.

Finally, to the same effect, in Kelo the Supreme Court stated "(n)or would the City be allowed to take property under the mere pretext of a public purpose, when its actual purpose was to bestow a private benefit." id.  Again, see the above discussion, and paragraph 55 of the first amended complaint.

Defendants wrongly argue that paragraphs 17-22 of the first amended complaint adopt the argument that Kelo established a new minimum test to determine the sufficiency of a redevelopment plan.  To the contrary, the cited portions of the first amended complaint state the facts that no redevelopment plan was prepared by defendants in connection with the Skyland Project or the neighboring area, and that the only plans prepared for the Skyland Project were those prepared by the Redeveloper.  These factual allegations buttress plaintiffs' claim that the Skyland Project is a government enabled transfer of the Skyland owners' property to the Redeveloper for the sole reason that the Redeveloper will put the Skyland Assemblage to a more productive use, and, thus is a "one-to-one transfer of property, executed outside the confines of an integrated development plan", which the Supreme Court said in Kelo would be impermissible.

See, Kelo, 125 S. Ct. at 2667.

16

Defendants concede that "(e)veryone agrees that a one-to-one transfer of property from one owner to another for the purpose of advancing the private interests of the transferee" citing Kelo, 125 S.Ct. at 2661.  (Defendants' memorandum, at 5).  However, defendants then argue that the allegations of the first amended complaint belie plaintiffs' argument that that is what has occurred at Skyland. *id.*, citing the allegations of a competitive process to select the Redeveloper, and that community activists, neighbors and NCRC spurred the redevelopment effort.  Defendants are wrong.  None of those allegations conflicts with the factual claim that the Skyland Project is an impermissible private use taking.  The manner in which the Redeveloper was chosen is irrelevant.  What is critical is that, however selected, the Redeveloper became the chosen instrument of NCRC and the private party whose own interests were the primary objective of the Skyland Legislation.

Similarly, the fact that community members or NCRC itself initiated the Skyland redevelopment effort is also irrelevant.  What is relevant is the fact that, as alleged, that there was no governmental study, consideration or evaluation of the developmental needs of the Skyland Center, its surrounding neighborhood or the larger area before the Redeveloper was chosen by NCRC, and not even when the Skyland Legislation was proposed and enacted two years later.  See, *e.g.*, the concurrence of Kennedy, J. in Kelo, where, in commenting on the reason why there was no need for heightened judicial scrutiny in Kelo, he wrote

> This taking occurred in the context of a comprehensive development plan meant to address a serious city-wide depression, and the projected economic benefits of the project cannot be characterized as *de minimus*.  The identity of most of the private beneficiaries were unknown at the time the city formulated its plans.  The city complied with elaborate procedural requirements that facilitate review of the record and inquiry into the city's purposes.  In sum, while there may be categories of cases in which the transfers are so suspicious, or the procedures employed so prone to abuse, or the purported benefits are so trivial or implausible, that court should presume an impermissible private purpose, no such circumstances are present in this case.

17

125 S. Ct. at 2670-71.

What is further relevant on this point, but not mentioned by defendants in their memorandum, are the allegations in paras.18, 20, and 22-24 of the first amended complaint that defendant NCRC did not prepare any plans for the project before selecting the Redeveloper and had no obligation to the Redeveloper to prepare any such development plans, that the Skyland Project was not contingent on any findings that the area was blighted or a slum, or suffered other similar conditions, and, notwithstanding the foregoing, NCRC had the obligation under the JDA to obtain eminent domain authority, which it did not then have, to acquire the Skyland Assemblage and sell it to the Redeveloper for his own primary benefit.

Defendants' argument that plaintiffs' own allegations make clear that the Skyland project began with and has as its core the public benefits of economic development in Ward 7 and the removal of blight and dilapidation and improving the community (Defendants' memorandum, at 5) is a severe misreading and mischaracterization of the first amended complaint and is wrong. Defendants do not cite any part of the pleading for their conclusory argument. Paragraph 17 of the first amended complaint stating that community activists wanted an improved Skyland Center containing a Starbucks coffee shop, book store and white table cloth restaurant and NCRC then became interested is the only provision that bears on the inception of the Skyland project. No other provision of the first amended complaint provides a basis for defendants' argument. But more importantly, regardless of how the Skyland project began, for purposes of this action, the critical question is what was the Council's purpose in enacting the Skyland Legislation. As the first complaint amply alleges and demonstrates, its primary motivation and primary purpose was to enable NCRC to perform the JDA with its preselected chosen instrument

18

by way of acquiring the Skyland Assemblage by eminent domain and conveying it to the Redeveloper in a transaction from which NCRC would reap financial rewards..

Defendants' argument that plaintiffs cannot allege the Council's stated public purposes are improper because a taking for economic development and to remove slum and blight conditions are constitutionally permissible public purposes under Kelo and Berman v. Parker 348 U.S. 26 (1954) is both incorrect and irrelevant. It is incorrect and irrelevant, because, as alleged in the first amended complaint, the Council's findings of such purposes are pretextual and, at least with respect to blight, wrong and without basis. As Kelo makes clear, although under Berman and Midkiff and other cases the courts broadly defer to the legislature in determining what is a public use (Kelo, 125 S.Ct. at 2667-68), where the legislature acts in a pretextual manner or in an otherwise illegitimate manner for the purpose of conferring a private benefit, the legislature's actions and its motivations are subjected to heightened scrutiny by the courts. Kelo, 125 S.Ct. at 2667, and see n. 17.

Defendants' final conclusory argument that the Skyland Legislation does not represent a private use taking, and is not one of the impermissible hypothetical takings where a purely private purpose occurred as described in Kelo (Defendants' memorandum, at 6) is wrong, but, in this context, it is also an argument based on defendants' own allegations of fact and not based on facts alleged in the first amended complaint. Such an argument can be made, if at all, only in a summary judgment motion or at trial where all the relevant facts are at hand, but not at this early stage on a motion to dismiss for failure to state a claim.

The first amended complaint, thus, alleges sufficient facts to support the claim that the sole purpose of the Skyland Legislation was to enable NCRC to acquire the Skyland Assemblage and sell it to the Redeveloper for his primary benefit. Thus, Count I of the first amended

complaint states a claim that the Skyland Legislation constitutes an impermissible taking for a private use in violation of the Fifth Amendment Takings Clause.

3. The peculiar and suspicious one-to-one nature of the transaction between NCRC and the Redeveloper and the pretextual nature of the Skyland Legislation mandate the Court to give heightened and careful scrutiny to the Skyland Legislation in this case.

Plaintiffs supplement their Memorandum of Points and Authorities in opposition to defendants' motion to dismiss the complaint (Doc. #11, at 11-13) on the issue of whether the Court should grant broad judicial deference to the Council's actions on the authority of Berman v. Parker and Hawaii Housing Authority v. Midkiff, *supra*. Based on the circumstances of the transactions between NCRC and the Redeveloper, the JDA's provision of financial benefits to NCRC, the relationship and sequencing of those transactions and the JDA to the Skyland Legislation, the pretextual findings and declarations and secretive actions of the Council and the rubberstamp nature of the Council's actions in enacting the Skyland Legislation without considering or approving any plans for the site or the larger area other than the Redeveloper's own plans for the site, all as alleged in the first amended complaint, describe a situation diametrically opposed to that found in New London in Kelo. See the above-quoted portion of Justice Kennedy's concurrence in Kelo, plaintiffs' memorandum, *supra.,* at 17. Further, as the Supreme Court stated in Kelo, if a case of "a one-to-one transfer of property, executed outside the confines of a an integrated development plan" were encountered, "...such an unusual exercise of government power would certainly raise a suspicion that a private plan was afoot(.)" Kelo, 125 S.Ct. at 2667.

The instant case is such a case that would be described as one of the hypothetical cases referred to in <u>Kelo</u>, *id.* in which the Court should grant heightened and careful scrutiny to the Skyland Legislation.

<u>CONCLUSION</u>

For all the foregoing reasons, defendants' motion to dismiss the first amended complaint should be denied.  Alternatively, the Court should grant plaintiffs leave to amend the First Amended Complaint as to both defendants.  There is no basis for the Court to conclude beyond any doubt that plaintiffs cannot prove any set of facts in support of their claims for relief on the face of the First Amended Complaint.

<u>HEARING REQUESTED</u>

Plaintiffs request an oral hearing on defendants' motion .

Respectfully submitted,


_____/s/_____
Ralph Werner
D.C. Bar No. 88161
1020 Nineteenth Street, N.W.,
Suite 400
Washington, D.C. 20036
(202) 331-8940
Attorney for Plaintiffs