UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SAMUEL FRANCO, et. al.,                     :
                                    Plaintiffs    :        Civil No. 1:05-CV-01058 (RMU)
                v.                          :
                                            :
THE DISTRICT OF COLUMBIA, et. al.,          :        ORAL HEARING REQUESTED
                                    Defendants.    :

PLAINTIFFS NATHAN FRANCO, ALLAN FRANCO AND D MART, INC.'S MOTION
FOR RECONSIDERATION OF ORDER
GRANTING DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT
AND FOR LEAVE TO FILE SECOND AMENDED COMPLAINT

Plaintiffs Nathan Franco, Allan Franco and D Mart, Inc., by their attorney herein, move

the Court to reconsider and vacate that portion of its memorandum opinion and order dated

March 22, 2006  dismissing the first amended complaint of plaintiffs Nathan Franco, Allan

Franco and D Mart, Inc. and for leave for plaintiffs Nathan Franco, Allan Franco and D Mart,

Inc. to file a second amended complaint.[1]

ARGUMENT

In its memorandum opinion dated March 22, 2006, ("Mem. Op.") the Court granted

defendants District of Columbia's and National Capital Revitalization Corporation's joint

motion to dismiss the first amended complaint as to plaintiffs Nathan Franco, Allan Franco and

D Mart, Inc. on the grounds that their claims are not ripe.  In Sec. IIIC of its memorandum

opinion, the Court held that said three plaintiffs' claims are premature because (1) their property

has not yet been taken, and (2) they have not yet been denied just compensation.  Mem. Op. at

13-14.

---

[1] Plaintiff Samuel Franco does not seek reconsideration or revision of that branch of the memorandum opinion and order (Sec. IIIB, at 5-11) as it relates to the dismissal of his claims in this action.

This holding is in error because (1) the leasehold interests of Nathan Franco, Allan Franco and D Mart, Inc. (sometimes hereinafter the "Leasehold Plaintiffs") have been taken by defendant National Capital Revitalization Corporation ("NCRC") in eminent domain proceedings instituted in July, 2005, and (2) said plaintiffs do not seek just compensation for their leasehold property interests, but rather seek equitable relief against and damages for the unconstitutional taking of their property for a private use. Under applicable Supreme Court case law, there is no requirement that said must exhaust their state court remedies, and the availability of a state court forum in which to seek just compensation is irrelevant to their claims.

Plaintiffs Nathan Franco and Allan Franco, along with plaintiff Samuel Franco, are lessees of property in the Skyland Shopping Center, 2834 Alabama Avenue, S.E. (the "Leased Property").[2] Plaintiff D Mart, Inc. operates a discount store business at the Leased Property, 2834 Alabama Avenue, S.E. and at 2838 Alabama Avenue, S.E., the adjacent property owned by plaintiff Samuel Franco (the "Samuel Franco Property"), both of which properties are operated as a single unit for D Mart's business. D Mart, Inc. is a subtenant of the Leased Property, and a tenant of the Samuel Franco Property under a written lease. In contrast to plaintiff Samuel Franco, none of the Leasehold Plaintiffs owns any real property in the Skyland Shopping Center.

In July, 2005, defendant NCRC filed a series of six condemnation actions in the Superior Court of the District of Columbia seeking to take by eminent domain fee simple title to certain property in the Skyland Shopping Center, including the properties in which three Leasehold Plaintiff hold leasehold interests, the Leasehold Property and the Samuel Franco Property.. In *NCRC v. 3.98 Acres of Land in the District of Columbia, 2800-2834 Alabama Avenue, S.E. and First FSK Limited Partnership*, Civil Action No. 05-5333 (the "First FSK Condemnation Case"),

---

[2] The Samuel Franco Property is referred to as Property 1 and the Leased Property, 2834 Alabama Avenue, S.E. is referred to as Property 2 in Mem.Op.

NCRC seeks to condemn fee simple title to the property owned by First FSK Limited Partnership, including among other parcels, 2834 Alabama Avenue, S.E., the Leasehold Property, leased by the Leasehold Plaintiffs and plaintiff Samuel Franco. In *NCRC v. 0.03 Acres of Land in the District of Columbia, 2838 Alabama Avenue, S.E. and Samuel N. Franco,* Civil Action No. 05-CA-5335, (the "Samuel Franco Condemnation Case") NCRC seeks to condemn fee simple title to the property owned by plaintiff Samuel Franco in which plaintiff D Mart, Inc. holds a leasehold interest. In each case, by seeking to condemn fee simple title, NCRC seeks to condemn and extinguish not only the fee ownership interests, but also all leasehold interests in such property. Thus, at the time that NCRC would acquire fee simple title to each such property, the leasehold interests of the Leasehold Plaintiffs and plaintiff Samuel Franco would be condemned and terminated. No separate condemnation action was brought or is required to condemn such leasehold interests. See D.C. Code Secs. 16-1314, 1316.

Indeed, on November 18, 2005, defendant NCRC deposited sufficient funds in the registry of the Superior Court to enable it immediately to obtain fee simple title to both 2834 Alabama Avenue, S.E. and 2838 Alabama Avenue, S.E., thereby acquiring the Leasehold Plaintiffs' leasehold interests in each property at that time. D.C. Code Sec. 16-1314(b). None of the three Leasehold Plaintiffs is a party to either of these condemnation actions or to any other condemnation action. Further, as described below, none of the Leasehold Plaintiffs is entitled to share in the just compensation due for the taking of the Leasehold Property or the Samuel Franco Property.

Based on the mistaken understanding that the Leased Property had not been taken, the Court stated it would not inject itself into the constitutional and other legal issues raised by the amended complaint. (Mem. Op. at 14). The Court concluded that if such a condemnation action were brought against the Leasehold Plaintiffs' leased property, 2834 Alabama Avenue and 2838

Alabama Avenue, S.E. , that such Leasehold Plaintiffs would be parties to such actions and would be entitled to claim and receive just compensation for their leasehold interests therein. *id.* This conclusion is not correct, because none of the Leasehold Plaintiffs has any rights under their respective leases of those properties to share in any condemnation award and obtain just compensation for the value of their leasehold interests (even if such compensation were relevant in this action), and none of the Leasehold Plaintiffs is a party to either the First FSK Condemnation Case or the Samuel Franco Condemnation Case..

Plaintiffs Samuel Franco, Nathan Franco and Allan Franco, co-partners, trading as "Discount Mart", (collectively sometimes the "Tenant") leased 2834 Alabama Avenue, S.E. from First FSK Limited Partnership  by a written lease dated October 31, 1981 (the "Lease"). The Lease was amended by a written amendment dated September 27, 1996, extending the lease term for 10 years to October 31, 2006 with an option to renew the term for an additional 5 years.

The Lease as amended contains the following provision regarding condemnation:

24.  (a) In the event the demised premises, or any substantial part thereof shall be taken or condemned during the existence of this lease by any competent authority through eminent domain or other proceedings or acts not resulting from the failure of the landlord to carry out their obligations hereunder, this lease may be terminated by the Landlord or the Tenant upon ten (10) days written notice to the other.

(b) In the event of a condemnation as set forth above, Tenant shall be entitled to claim moving and relocation expenses from the condemning authority and shall further be entitled to claim from the condemnation fund the amount of any unamortized fixtures and equipment that Tenant shall have attached to the demised premises during the term hereof.

(c) Within sixty (60) days from the date of execution hereof, Tenant shall give to Landlord a written itemized list of the fixtures and equipment attached to the demised premises as contemplated in subparagraph (b) above, together with receipted bill or invoice showing the date of acquisition and cost of each such fixture or item of equipment.  In the event Tenant shall acquire additional fixtures or equipment to be attached to the realty during the term hereof, the, and in such event, within thirty (30) days of such acquisition, Tenant shall give to Landlord a written itemized list of such acquisitions together with receipted bills or invoices showing the date of acquisition and

cost of same.  The requirements of this subparagraph (c) shall be a condition precedent to Tenant claiming from any condemnation award any funds for unamortized fixtures and equipment belonging to Tenant and having been attached to the demised premises.

Thus, plaintiffs as Tenant of 2834 Alabama Avenue, S.E., are not entitled to share in any compensation for their leasehold interest in that property, the Leasehold Property, in the First FSK Condemnation Case.

Similarly, plaintiff D Mart, Inc., as lessee of 2838 Alabama Avenue, S.E. has no right under its lease with plaintiff Samuel Franco, the landlord of that property, to participate in any condemnation award in for its leasehold interest in that property in the Samuel Franco Condemnation Case.

Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City, 473 U.S.172, 194 (1985) is inapposite to this case.  Williamson County involved a regulatory taking for an admittedly public use or purpose, unlike the case at bar.  Here, the gravamen of the first amended complaint is that the Skyland Legislation constitutes a taking of plaintiffs' property for a non-public use and, thus, under the Fifth Amendment takings clause, the Skyland Legislation is *per se* unconstitutional and no amount of just compensation is relevant or can be awarded to restore or vindicate plaintiffs' rights against such a taking of their property.  Thus, the issue of just compensation is irrelevant in this action.  Patel v. City of Chicago, 383 F.3d 569,574 (7th Cir. 2004), also relied on by the Court similarly involved a taking for a public use and is likewise inapplicable to the instant action.  Neither Williamson County nor Patel involved a claim under 42 U.S.C. §1983 which did not seek just compensation, but which seeks equitable relief and monetary damages for an unconstitutional taking of private property, as does the instant case.  The applicable rule, as stated in Patsy v. Board of Regents of the State of Florida, 459 U.S. 496, 516 (1982)  is that the Leasehold Plaintiffs need not exhaust their

administrative remedies or first seek just compensation in order to bring this action under §1983.

In sum, plaintiffs Nathan Franco, Allan Franco and D Mart, Inc. have suffered and will continue to suffer legal and economic injury and harm by the unlawful taking of their leasehold property interests for a private use, and have no forum other than the instant action in this Court in which to bring their §1983 claims of unconstitutional taking of their property against these defendants.

For all these reasons, the Court should reconsider its Memorandum Opinion and order of March 22, 2006 and vacate it as to plaintiffs Nathan Franco, Allan Franco and D Mart, Inc. Said plaintiffs seek leave to file a second amended complaint asserting these pertinent factual allegations, and attach a copy to this motion (Attachment A). Defendants will not be prejudiced by such amendment.

<u>CONCLUSION</u>

For all the foregoing reasons, the Court's memorandum opinion and order dated March 22, 2006 dismissing the amended complaint as to plaintiffs Nathan Franco, Allan Franco and D Mart, Inc. should be vacated and plaintiffs Nathan Franco, Allan Franco and D Mart, Inc. should be granted leave to file their second amended complaint.

<u>HEARING REQUESTED</u>

Plaintiffs request an oral hearing on this motion.

Dated: April 3, 2006                        Respectfully submitted,


                                    _____/s/_____
                                    Ralph Werner, D.C. Bar No. 88161
                                    1020 Nineteenth Street, N.W., Suite 400
                                    Washington, D.C. 20036
                                    (202) 331-8940
                                    Attorney for Plaintiffs

# ATTACHMENT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATHAN FRANCO                          :
2838 Alabama Avenue, S.E.              :          Civil Action No.
Washington, DC 20020,                  :          1:05-CV-01058 (RMU)
                                       :
                                       :
ALLEN FRANCO                           :          ACTION INVOLVING REAL
2838 Alabama Avenue, S.E.              :          PROPERTY
Washington, DC 20020,                  :
                                       :
           and                         :
                                       :
D MART, INC.,                          :
2838 Alabama Avenue, S.E.              :
Washington, DC 20020,                  :
                   Plaintiffs          :
                                       :
           v.                          :
                                       :
THE DISTRICT OF COLUMBIA               :
Office of the Mayor                    :
1350 Pennsylvania Avenue, N.W.         :
Washington, DC 20004,                  :
                                       :
NATIONAL CAPITAL                       :
REVITALIZATION CORPORATION             :
Serve: Anthony C. Freeman, President   :
2025 M Street, NW, Suite 600           :
Washington, DC 20036,                  :
                                       :
           and                         :
                                       :
RLA REVITALIZATION CORPORATION :
Serve: Anthony C. Freeman, President   :
2025 M Street, NW, Suite 600           :
Washington, DC 20036,                  :
                   Defendants.         :

SECOND AMENDED
COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTION
UNDER THE UNITED STATES CONSTITUTION AND 42 U.S.C. §1983

Plaintiffs, Nathan Franco, Allen Franco and D Mart, Inc., by their attorney herein

allege as and for their complaint against defendants herein as follows:

JURISDICTION AND VENUE

1.  This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332 in that the claims hereunder arise directly under the Fifth Amendment of the United States Constitution as well as under 42 U.S.C. §1983.  Venue is proper under 28 U.S.C. §1391(b).

PARTIES

2.  Plaintiffs Nathan Franco and Allen Franco are adult citizens of the State of Maryland and, together with Samuel Franco, also an adult citizen of the State of Maryland, are lessees of certain improved real property located at 2834 Alabama Avenue, SE, Washington, DC 20020 under a valuable lease that, with renewal option, has a remaining term of more than 5 years (the "Leased Property").  In addition Samuel Franco is the owner of certain improved real property located at 2838 Alabama Avenue, SE, Washington, DC 20020 (the "Samuel Franco Property"), which is adjacent to 2834 Alabama Avenue, and is used in common with the Leased Property. Both said properties (sometimes collectively the "Property") are located in the Skyland Shopping Center located at the intersection of Alabama Avenue, Good Hope Road and Naylor Road, S.E., Washington, D.C. (the Skyland Center").  Plaintiff D Mart, Inc., organized under the laws of the District of Columbia, owns and operates a retail discount store covering about 22,000 sq. ft. of floor area, the entire enclosed area of the Property, and is tenant of the Samuel Franco Property and a sub-tenant of the Leased Property.  Plaintiffs together with Samuel Franco have operated their business at the Skyland Center continuously since 1976.

3.  Defendant District of Columbia ("D.C.") is a municipal corporation which is the government of the District of Columbia.  Defendant D.C. is sued herein both in its executive capacity, including the Mayor of the District of Columbia (the "Mayor"), his agents, and

departments, agencies and entities under his authority, and in its legislative capacity represented by the Council of the District of Columbia (the "Council").

4.  Defendant National Capital Revitalization Corporation ("NCRC") is a municipal corporation and independent instrumentality of defendant D.C. organized and existing under the National Capital Revitalization Corporation Act of 1998, D.C. Code Sec. 2-1219.01 *et seq.,* as amended (the "NCRC Act")   Defendant RLA Revitalization Corporation also is a municipal corporation and an instrumentality of defendant D.C., and is a subsidiary of NCRC ("RLA").

<u>NATURE OF THE ACTION</u>

5.  Plaintiffs, lessees of the Leased Property, and a retail discount store occupying the Property in the Skyland Center bring this action for a declaratory judgment and injunctive and other relief against defendants who seek to acquire plaintiffs' Property by eminent domain for a private use in violation of plaintiffs' rights under the Fifth Amendment of the United States Constitution.  Plaintiffs challenge as unconstitutional legislation that would permit defendant government to seize a privately owned long established and fully functioning shopping center by eminent domain for the sole purpose of selling it to another private person who would replace it with an allegedly better shopping center built for his own benefit.

6.  In about September, 2002, defendant NCRC entered into a written joint development agreement (the "JDA") with a private developer comprised of The Rappaport Companies, Harrison-Malone Development, LLC, Marshall Heights Community Development Organization, Inc. and Washington East Foundation, Inc. (the "Redeveloper") to redevelop the approximately 11.5 acres of real property (including plaintiffs' Property) in the Skyland Center plus an additional approximately 5 acres of vacant undeveloped residentially zone land, separately owned and separate from but adjacent to the Skyland Center (the "Skyland Addition") (collectively with the Skyland Center the "Skyland Assemblage").

9

7.  The JDA provided that NCRC would share in the profits of such redevelopment and called for various actions to be taken by the Redeveloper as well as by defendants D.C. and NCRC.  In performance of the JDA, defendants D.C. and NCRC have caused the defendant Council to enact a series of legislative acts that would authorize defendant NCRC to acquire the Skyland Assemblage by eminent domain.  NCRC's primary if not sole objective in this intended acquisition is to perform its undertakings under the JDA and to assemble and consolidate ownership of the Skyland Assemblage in defendant NCRC, displace all of the approximately 25 current businesses in the Skyland Center, and then sell the Skyland Assemblage to the Redeveloper who would demolish all of the improvements, and clear the site for redevelopment, and design and build a new shopping center on the site (collectively the "Skyland Project").

8.  In taking their actions complained of herein, defendants D.C. and NCRC have acted under color of law within the meaning of 42 U.S.C. § 1983 and are responsible for the deprivation of plaintiffs' constitutional rights under the Fifth Amendment of the U.S. Constitution.

9.  At all times relevant to this action, defendant D.C. acted solely in a governmental capacity under color of law by (i) drafting, funding, urging and otherwise facilitating the enactment of the legislation described in this complaint hereafter, (ii) implementing and facilitating through legislation enacted by the Council, (iii) entering into and performing agreements, including providing funds, and (iv) taking other executive action for the purpose of the unconstitutional taking of property and carrying out the Skyland Project, as alleged herein.

10.  At all relevant times, defendant NCRC has acted in a governmental capacity under color of law, in (I) participating in and promoting the Skyland Project and selecting the

Redeveloper to carry it out, (ii) promoting, urging and otherwise facilitating the enactment of

the legislation described in this complaint designed to facilitate the unconstitutional takings of

the Skyland Assemblage and the carrying out of the Skyland Project alleged hereafter, (iii)

proceeding to implement or execute a sustained program of acquiring said real property under

the threat of an unconstitutional taking by eminent domain, and (iv) carrying out the Skyland

Project.

11.  The Skyland Center is an approximately 11.5 acre shopping center located at the

intersection of Alabama Avenue, Good Hope Road, and Naylor Road, S.E. in the District of

Columbia.  Upon information and belief, the Skyland  Center is comprised of a number of

contiguous separately owned parcels, has been continuously in operation for more than fifty

years, has been fully leased for at least the last five years, and many of the approximately 25

business tenants have long-term leases. The present tenants include regional and national

retailers, such as CVS Pharmacy and Autozone Auto Supplies, as well as a variety of

neighborhood businesses, such as a supermarket, a general merchandise discount store, and

beauty care, food, liquor and music stores, and serve the day to day retail needs of the

community.  In addition, at all relevant times the U.S. Postal Service has operated the Anacostia

Post Office at the Skyland Center and defendant D.C. has provided and now provides certain

municipal employment services in facilities they each lease at the Skyland Center.

12.  Upon information and belief, at all relevant times the Skyland Center and all of the

business properties located thereon have been and now are substantially in compliance with

applicable laws and regulations, including, among other things, applicable building and health

codes, and the Skyland Center is not (and is not located in) a slum area, blighted area,

redevelopment area or project area or other area eligible to be taken by eminent domain within

the meaning of or under the authority of the NCRC Act or any other District of Columbia law or regulation.

13.   Upon information and belief, the 5 acre Skyland Addition has never been part of the Skyland Center, has no functional relationship to it, and  is not (and is not located in) a slum area, blighted area, redevelopment area or project area or other area eligible to be taken by eminent domain within the meaning of or under the authority of the NCRC Act or any other District of Columbia law or regulation.  Upon information and belief, defendants NCRC and D.C. have included the Skyland Addition in the Skyland Assemblage and the Skyland Project at the behest of community activist solely in an attempt to provide enough parking space anticipated to be needed by the redeveloper to make the Skyland Project, a private use, feasible. Upon information and belief, the Skyland Project is not feasible.

14.   Plaintiffs have suffered and will continue to suffer substantial injury to their constitutionally protected property, being their leasehold interests in the Leased Property and the Samuel Franco Property.  Said injury is proximately caused by the origination, enactment, as well as the application to plaintiffs and their Property of certain legislation of defendant D.C. and defendants NCRC's and D.C.'s actions related thereto in originating and carrying out the Skyland Project as alleged herein.

15.   The legislation in question is a series of related enacted bills concerning the Skyland Assemblage (collectively the "Skyland Legislation").  The enactment, application and implementation of this legislation is unconstitutional and unlawful in at least the following respects:

(a) the legislation would unconstitutionally take plaintiffs' Property in particular and the Skyland Assemblage generally for a private use, the Skyland Project, and not for a public use, and, indeed defendant NCRC has already taken plaintiffs' Property by condemnation;

(b) the permanent portion of the legislation contains false and pretextual findings and was enacted in violation of the D.C. Home Rule Act and the Council rules thereunder and would unconstitutionally deprive plaintiffs of their Property without due process of law.

©) the legislation does not state the public purpose or use for which plaintiffs' Property or any of the Skyland Assemblage is to be taken and is unconstitutionally vague;

(d) the legislation was enacted as emergency and temporary legislation in violation of the D.C. Home Rule Act, D.C. Code Sec.1-204.12 and in violation of Council rules; and

(e) the legislation was enacted and is being implemented by defendants D.C. and NCRC in violation of the D.C. Environmental Policy Act of 1989 and the regulations thereunder.

16.  Defendants D.C. and NCRC have taken and are threatening to take the actions referred to in paragraph 15 above wrongfully, and are thereby depriving plaintiffs of their constitutional rights and their Property, and are threatening to seize plaintiffs' Property and are causing them other immediate harm in their business and subjecting them to uncertainty and loss due to the threatened taking of their Property.  Unless said legislation is declared unconstitutional and unlawful, and defendants are temporarily, preliminarily and permanently enjoined and restrained from implementing any such legislation or otherwise attempting to acquire plaintiffs' Property or the Skyland Assemblage or any part thereof by eminent domain, plaintiffs, who are suffering economic and other harm as a result of defendants' actions, will continue to suffer irreparable harm.

## FACTS COMMON TO ALL COUNTS

17.  Upon information and belief, commencing several years prior to 2002, defendant NCRC, responding to the insistence of certain community activists, individuals and organizations, in the Hillcrest area who wanted an improved Skyland Center containing new facilities such as a white table cloth restaurant, a Starbucks coffee shop and a book store, became interested in redeveloping the Skyland Center.  At all relevant times the Skyland Center has been and now is a privately owned, fully leased and operating, taxpaying and economically viable neighborhood shopping center serving the needs of the Hillcrest and adjoining communities in Southeast Washington, D.C.

18.  Upon information and belief, in or about 2001 or in early 2002, NCRC solicited expressions of interest or proposals from private developers interested in redeveloping the Skyland Center in conjunction with defendant NCRC.  Upon information and belief, in making such solicitation, defendant NCRC did not prepare or provide any plan or comprehensive detailed scheme as to what the redeveloped Skyland Center should be, but, instead, required the applicants to prepare and provide such plans and data of how they would redevelop the Skyland Assemblage..

19.  In about May, 2002, defendant NCRC selected the Redeveloper to redevelop the Skyland Center.  Thereafter, NCRC and the Redeveloper negotiated the JDA, covering the Skyland Project, which was completed and executed in about September, 2002.

20.  The JDA provided, among other things, that (a) the purchase price of the Skyland Assemblage would be the fair market value of that property in its "as is" condition as determined by agreement of NCRC and the Redeveloper, (b) the Redeveloper would (I) prepare the development plan for the Skyland Project, (ii) obtain a lease from an anchor retail non-grocery tenant of at least 50,000 sq. ft., (iii) expend at least $100,000 in marketing and due

14

diligence costs through non-affiliated parties, (iv) enter into a development entity agreement with defendant NCRC whereby defendant NCRC would receive a percentage of interest in the operating cash flow and capital proceeds from the Skyland Project, and (v) be responsible for clearing the site and constructing the new shopping center, and ©) defendant NCRC would be responsible for (I) acquiring the Skyland Assemblage, obtaining funding for its activities from defendant D.C., and (iii) obtaining "authorization and/or approval by the NCRC's Board of Directors and defendant Council of NCRC's use of eminent domain to acquire the Skyland Assemblage.

21.  The JDA also provided, in part, that the Redeveloper would post a deposit which would become non-refundable upon defendant NCRC obtaining eminent domain authority or acquiring the Skyland Assemblage, and that closing on the purchase of the Skyland Assemblage by the Redeveloper (or its designee) had to occur by July 1, 2004.

22.  Upon information and belief, defendant NCRC had no responsibility under the JDA to prepare any development plans for the Skyland Project, and at all relevant times neither defendants NCRC or DC or any other public agency prepared any such plans for the Skyland Project, the Skyland Assemblage or the neighboring area under the JDA or under authority of any law or regulation.  The only plans for the redevelopment of the Skyland Center and the Skyland Assemblage were those prepared by the Redeveloper for the Skyland Project.

23.  Upon information and belief, neither the Skyland Project nor the JDA, nor the undertakings of defendants D.C. or NCRC or the Redeveloper to one another were in any respect contingent on the existence or finding of blight, slums or other similar conditions on the Skyland Assemblage, other than any environmental remediation costs of the Skyland

Assemblage which might be encountered and which might prevent the parties from agreeing on the purchase price.

24. After execution of the JDA in 2002, defendants D.C. and NCRC set about performing defendant NCRC's undertakings under the JDA, including obtaining authority for defendant NCRC from defendant Council to use eminent domain to acquire the Skyland Assemblage. At all times prior to the Skyland Legislation, hereinafter described, including at the time of entering into the JDA, defendant NCRC lacked any such authority under the NCRC Act or any other law. Defendants D.C. and NCRC proposed a series of enabling legislative acts to be enacted by the Council to provide NCRC such authority to acquire the Skyland Assemblage by eminent domain to carry out its obligations to the Redeveloper under the JDA.

25. The first bill proposed as part of the Skyland Legislation is B15-752, entitled the "National Capital Revitalization Corporation Eminent Domain Clarification and Skyland Eminent Domain Approval Amendment Act of 2004" (the "Skyland Permanent Act"), which was introduced in the Council on March 3, 2004. B15-752 would further amend the NCRC Act with regard to the exercise of defendant NCRC's powers of eminent domain. In addition, separately and in relevant part, B15-752 declared that, notwithstanding the foregoing amendments of the NCRC Act, the Council finds that parcels comprising the Skyland Assemblage "are necessary and desirable for the public use [and] approves the exercise of eminent domain by the National Capital Revitalization Corporation or the RLA Revitalization Corporation [of those properties]." B15-752 did not specify any use for such properties, and did not state any basis for declaring them to be necessary and desirable for the public use.

Defendant Council held a public hearing on B15-752, the Skyland Permanent Act, on April 28, 2004.

26.  In a letter dated May 3, 2004, from Theodore N. Carter, President and Chief Executive Officer of defendant NCRC, to Council member Harold Brazil, Chairperson of the Committee on Economic Development of the Council, confirming testimony he gave at the April 28, 2004 public hearing, Mr. Carter stated:

> Second, the amendment ensures that the Skyland project can be undertaken in a timely manner. <u>As I emphasized in my testimony, NCRC will not exercise eminent domain until there is a commitment from an anchor tenant</u>. In addition, eminent domain may not ever be required depending upon the results of the negotiations conducted with the property owners. However, the existing legislation does not specify when the Council needs to approve the exercise of eminent domain. NCRC wanted the Council to authorize the redevelopment of the area and approve this project before acquisition of the Skyland parcels began, not after. We believe that advance approval for this authority will make it more likely that it will never be used.
> (Emphasis supplied)

No further action on B15-752 was taken until November 3, 2004 as alleged below.

27.  A second bill substantially identical to B15-752, B15-829, entitled the "National Capital Revitalization Corporation Eminent Domain Clarification and Skyland Eminent Domain Approval Emergency Amendment Act of 2004" ("First Skyland Emergency Act"), was introduced May 4, 2004, one week after the public hearing on B15-752.  This legislation would authorize, on an emergency basis, defendant NCRC to exercise eminent domain over the property at the Skyland Assemblage.  Like B15-752, the First Skyland Emergency Act did not specify any use for such properties, or any basis for declaring them to be necessary and desirable for the public use.  Resolution 15-556, declaring the emergency, stated in part that

> (t)he emergency is that site control is a precursor to obtaining firm
> commitments from retailers, and in order for development to proceed on a timely
> basis, the NCRC needs to bring to the table all land owners to commence the
> negotiation process and <u>also to show the commitment of the D.C. government to the
> project</u>. (Emphasis supplied)

The First Skyland Emergency Act was introduced and passed by the Council on May 4, 2004 and was signed by the Mayor of D.C. on May 21, 2004.  It took effect on that date and expired 90 days later on August 19, 2004.

28.  A third substantially identical bill, B15-830, entitled the "National Capital Revitalization Corporation Eminent Domain Clarification and Skyland Eminent Domain Approval Temporary Amendment Act of 2004", was also introduced on May 4, 2004, the same day the First Skyland Emergency Act was introduced, and passed by the Council and signed by the Mayor on June 23, 2004 as A15-460.  After the 30 day Congressional review period, it became law, L15-193, on September 30, 2004 (the "Skyland Temporary Act").  The Skyland Temporary Act had a duration of 225 days and expired May 13, 2005.  Like the first two measures, the Skyland Temporary Act did not specify the use for the properties to be taken or the basis for declaring it to be a public use.

29.  A fourth substantially identical bill, B15-952, entitled the "National Capital Revitalization Corporation Eminent Domain Clarification and Skyland Eminent Domain Approval Congressional Review Emergency Amendment Act of 2004", was introduced on July 12, 2004 and passed as an emergency measure on August 2, 2004 (the "Second Skyland Emergency Act").  Resolution 15-622, which declared the emergency on July 13, 2004, stated, in words virtually identical to those given in  Resolution 15-556, the first emergency declaration, that

(t)he emergency circumstances exist because site control is a precursor to obtaining firm commitments from retailers. In order for development to proceed in a timely manner, NCRC needs to bring to the table owners to commence the negotiation process.

As with the prior acts, the Second Skyland Emergency Act also did not specify any purpose or justification as a public use. It took effect on that date, August 2, 2004, and expired on October 31, 2004.

30. Upon information and belief, defendants NCRC and D.C. intended that the Second Skyland Emergency Act be enacted because the Skyland Temporary Act would not take effect, if at all, until after the expiration of the First Skyland Emergency Act, and defendants wanted NCRC to continue its activities in furtherance of the Skyland Project in the meantime. The First and Second Skyland Emergency Acts are essentially identical and the emergency declared for each is the same.

31. B15-752, the Skyland Permanent Act, was revised by the Committee on Economic Development of the Council in substantial respects and was reported out of the Committee on November 3, 2004, during the term of the Skyland Temporary Act, but (a) more than six months after the public hearing on B15-752, and (b) after the expiration of the first and second Skyland Emergency Acts and ©) after certain events occurred as described below. B15-752 was passed by the Council on December 7, 2004 and signed by the Mayor on December 29, 2004. The Skyland Permanent Act, A15-679, became law, L15-286, on April 5, 2005, after the 30 day Congressional review period.

32. Defendants NCRC and D.C. caused the Council to enact another legislative act closely related to, and at the same time as enactment of, the Skyland Permanent Act. That act entitled the Skyland Site Acquisition Support Act of 2004, B15-944, (the "Skyland Support

Act") was introduced on July 12, 2004 pursuant to letter dated July 9, 2004 from the Mayor to the Chairman of the Council. The purpose of B15-944 was to authorize the Mayor to transfer up to $2,000,000 to defendant NCRC to pay the cost of acquiring certain parcels of property at the Skyland Center from property owners willing to negotiate such a sale to defendant NCRC.

33. The Committee on Economic Development of the Council held a public roundtable on B15-944 on four days' public notice on October 26, 2004. Neither plaintiffs nor any other property owner, tenant or merchant at the Skyland Center attended that public roundtable because of the lack of adequate notice. Upon information and belief, the only attendees were representatives of defendants D.C.(including agents of the Mayor and the Council) and NCRC, the Redeveloper and the community supporting the measure, all of whom were given adequate notice of the roundtable. The Committee approved the measure on November 4, 2004, and it was passed by the Council on December 7, 2004 the same day as the Skyland Permanent Act. Thereafter, the Skyland Support Act became law, L15-302, effective April 8, 2005.

34. The foregoing five legislative actions relating to the Skyland Assemblage are collectively referred to as the Skyland Legislation. Defendants D.C. and NCRC conspired together to cause the enactment of the Skyland Legislation in the form and sequence alleged herein for the purpose of (a) enabling NCRC to commence actions leading to the acquisition of the Skyland Assemblage and the carrying out of the redevelopment of the Skyland Center and the Skyland Project under the JDA at the earliest possible date without there being formal permanent legislation authorizing such actions in effect and without defendants having the requisite funding to undertake the Skyland Project, and (b) delaying enactment of B15-752, the Skyland Permanent Act, to the latest possible date in the Council Period ending December 31,

2004 so as to permit the Council to revise B15-752 in any manner, deemed appropriate, including the addition of the pretextual, false and baseless findings described herein below without giving any public notice of or conducting a hearing on such substantially revised bill, to the latest date before enactment in that Council Period.

35.    Defendants D.C. and NCRC further conspired together to cause the revision of B15-752, the Skyland Permanent Act shortly before it was approved by the Council's Committee on Economic Development in November, 2004 to insert certain findings by the Council, including, among other things, that the Skyland Center was a "blighting factor" in the community. Although, prior to B15-752, the NCRC Act already contained a definition of a "blighted area" in which area NCRC had authority to exercise the power of eminent domain, that authority was insufficient for NCRC to acquire the Skyland Assemblage, and defendants D.C. and NCRC understood it to be inadequate.  Therefore, defendants caused the Council to revise B15-752 to contain certain legislative findings in a transparent and pretextual attempt to provide such authority to defendant NCRC.  Notwithstanding defendants' objectives, the legislative findings added to B15-752 by the Committee did not include any findings by the Council that either the Skyland Center or the Skyland Assemblage is blighted  or is a "blighted area" as defined by the NCRC Act, or that it otherwise qualified as an area to be taken by eminent domain under the NCRC Act or any other law.

36.    Said legislative findings inserted by the Committee in B15-752 at the behest of defendants D.C. and NCRC  were and remain pretextual, wrong, inaccurate, baseless and substantially irrelevant.  Among other things, Sec, 2(a)(12) added to B15-752 by the Committee which states that "The National Capitalization Revitalization Corporation ("Corporation") has advised the Council that the Skyland Center is blighted and that current conditions are an

impediment to the economic revitalization of this area of the District" is false in that defendant NCRC previously had admitted that it has made no findings, then current, that the Skyland Shopping Center is blighted, and has not made any such blight finding since then.

37.  These findings were inserted at that late date solely in an attempt to give the Skyland Legislation a constitutional basis and distinguish it from certain similar economic development related eminent domain legislation enacted by New London, CT, the constitutionality of was then being reviewed by the U.S. Supreme Court in the case of <u>Kelo v. City of New London</u>, CT, No 04-108, and to attempt to provide a basis for sustaining the constitutionality of B15-752 under established case law, even if the taking in <u>Kelo</u> were held unconstitutional.  The Supreme Court granted *certiorari* in the <u>Kelo</u> case on September 28, 2004, and rendered its decision on June 23, 2005.

38.  Further, in a related action filed July 13, 2004, <u>Rumber v. D.C.</u>, Civil No. 04-1170 RMU, certain other property owners and tenants at the Skyland Center alerted defendants herein to the issues raised by the Skyland Legislation relating to the <u>Kelo</u> case, and to the defective vagueness of the Skyland Legislation.  The combination of those events caused defendant D.C. through the Council to revise B15-752, the Skyland Permanent Act, as stated in paragraphs 34, 35 and 36 hereof, without giving public notice or conducting a public hearing on such revised measure and without affording plaintiffs, other interested owners and tenants, or other members of the public an opportunity to comment upon the revised measure before it was presented to and enacted by the full Council in November and December, 2004.

39.  The timing and method of processing, revising and enacting B15-752, the Skyland Permanent Act, and B15-944, the Skyland Support Act, were intended by defendants D.C. and

NCRC to enable those measures to be enacted at the latest possible date (a) with the least possible knowledge and participation of the public, especially the owners, merchants and tenants located in the Skyland Assemblage, and (b) without disrupting or delaying the actions of the defendants D.C. and NCRC in undertaking to acquire the Skyland Assemblage prior to receiving formal permanent legislative authority and funding.

40.  Upon information and belief, at no time relevant to this action, have defendants D.C., NCRC, RLA or any agents thereof made any findings that the Skyland Assemblage or area of the District in which it is located is blighted or otherwise eligible to be taken by eminent domain, or made any plans for the development or redevelopment of such areas to remedy any defective conditions or to promote economic development.

41.  In planning and taking the actions alleged in this complaint, defendants D.C. and NCRC knew that such revisions of B15-752 and the enactment of B15-944 would be opposed by the persons and entities who would be directly and adversely affected by those actions, including plaintiffs herein, the plaintiffs in Rumber v. D.C., the other owners, merchants and tenants in the Skyland Assemblage, and the numerous members of the community who value the existing Skyland Center and oppose the Skyland Project.  In taking these actions, defendants intentionally sought to deprive plaintiffs of their constitutional rights as alleged herein.

42.  In furtherance of the Skyland Project and the Skyland Legislation, on May 17, 2004, the Mayor transmitted to the Council two proposed resolutions, one which would authorize the creation of a "Retail Priority TIF Area" to support the redevelopment of over 200,000 square feet of retail activity known as the Skyland Project (PR15-860) and the second to authorize defendant D.C. to apply to the U.S. Department of Housing and Urban Development ("HUD") for funds to enable NCRC to acquire the Skyland Assemblage (PR15-861). After the Council's

Committee on Economic Development and Committee on Finance and Revenue conducted a joint public roundtable on June 17, 2004, both resolutions were passed by the Council on July 13, 2004 as R15-619 and R15-602 respectively.  Such measures are critical to enabling defendant NCRC to acquire the Skyland Assemblage and carry out the Skyland Project.  Upon information and belief, as of the date of this action, the Retail Priority TIF Area has not been created, and HUD has not provided any such funds.

43.  The Redeveloper, in cooperation with NCRC and D.C., testified at the joint public roundtable in support of said resolutions, and similarly gave testimony in support of the Skyland Legislation while it was being considered by the Council and its Committees prior to adoption.

44.  Upon information and belief, the cost to defendants D.C. and NCRC to carry out defendant NCRC's responsibilities with respect to the Skyland Project, including, among other things, land assembly, site preparation and business relocation, will substantially exceed $48 million, the amount defendant NCRC estimated for the Council in February, 2005.  Upon information and belief, defendant NCRC intends to sell the Skyland Assemblage to the private Redeveloper for about $5 million, representing more than a $25 million write down in the value of the Skyland Assemblage.  Upon information and belief, defendants D.C. and NCRC do not yet have the funds need to carry out the Skyland Project, and lack in excess of $13 million in such needed funds.

45.  By letter dated February 22, 2005, defendant NCRC offered to purchase plaintiff Samuel Franco's real property at the Skyland Center.  Upon information and belief, defendant NCRC sent similar letters to the other Skyland Assemblage owners on the same date.  By subsequent letters dated April 15, 2005 and April 28, 2005, defendant NCRC invited plaintiff Samuel Franco to exchange his interest in the Property for shares in a limited liability company

that would be organized and controlled by defendant NCRC (the "Skyland LLC Proposal"). Upon information and belief, one of the motivations for defendant NCRC's offer is that it lacks the funds to acquire the entire Skyland Assemblage by eminent domain.

46.  Defendant NCRC said in its letter of April 28, 2005 that unless by May 13, 2005 plaintiff Samuel Franco agrees to sell his property to NCRC or commits to exchange his property ownership for shares in the Skyland LLC that defendant NCRC is preparing to commence eminent domain proceedings against said plaintiff's property by May 31, 2005.  On May 6, 2005, defendant NCRC told a group of Skyland Assemblage owners and representatives, including plaintiff Samuel Franco's attorney, that it lacked the funds to acquire the Skyland Assemblage by eminent domain and that there was no anchor tenant commitment.

47.  NCRC has refused plaintiffs' D.C. Freedom of Information Act requests to provide plaintiffs any information or correspondence between NCRC or the Redeveloper and potential tenants including anchor or "big box" tenants such as Target or Shoppers Food Warehouse.

48.  Upon information and belief, NCRC further has informed Skyland Assemblage property owners in May and June, 2005 that any venture such as the Skyland LLC or any other venture to redevelop the Skyland Center including any of the Skyland Assemblage owners must also include NCRC and the Redeveloper or its principals.

49.  Upon information and belief, following selection of the Redeveloper in May, 2002, defendant NCRC failed and refused to discuss or negotiate with any Skyland Assemblage owner regarding the redevelopment of the Skyland Center or the Skyland Assemblage, despite said owners' repeated requests.

50.  In July, 2005, after commencement of this action in May, 2005, defendant NCRC commenced six separate condemnation actions in the Superior Court of the District of Columbia to acquire property in the Skyland Assemblage.  Among these actions are No. 05-

CA-5333 seeking to condemn the Leased Property together with other property in the Skyland

Center owned by First FSK Limited Partnership and No.05-CA-5335 seeking to condemn the

Samuel Franco Property.  Upon information and belief, on or about November 18, 2005, NCRC

deposited funds in the registry of the Superior Court and took title to the Property and all other

property that was the subject of those six condemnation actions.

51.  Plaintiffs Nathan Franco and Allan Franco, along with Samuel Franco as lessees of

the Leased Property are not parties to condemnation action No. 05-CA-5333 affecting that

property, and plaintiff D Mart, Inc. is not a party to condemnation action No. 05-CA-5335

affecting the Samuel Franco Property, and said plaintiffs' respective leases for the Leased

Property and the Samuel Franco Property do not permit them to receive any part of the just

compensation that may be awarded for the value of those leasehold interests in those

condemnation cases.

52.  Upon information and belief, as of July 1, 2004 and at all times thereafter, the JDA

has been terminated or defendant NCRC and the Redeveloper each have had the right to

terminate the JDA.

<u>COUNT I</u>
(Taking In Violation of the Takings Clause Public Use Provisions
of the Fifth Amendment of the U.S. Constitution)

53.  Plaintiffs repeat the allegations in paragraphs 1 through 52 hereof.

54.  Plaintiffs' Property is property that may not be taken except for a public use and on

payment of just compensation under the Fifth Amendment of the U.S. Constitution.

55.  The First and Second Skyland Emergency Acts, the Skyland Temporary Act and the

Skyland Permanent Act all would authorize defendant NCRC to take plaintiffs' Property by

eminent domain solely for a private and non-public use, *i.e.* redevelopment of the Skyland

Shopping Center as a shopping center by a private entity, the Redeveloper, for its own primary

benefit on the alleged grounds that such redevelopment would provide an upgraded shopping center in place of the Skyland Center, create more jobs, increase tax revenues and otherwise foster economic development.

56.  As such, the taking of the Skyland Assemblage would be an assemblage of the Skyland Assemblage for redevelopment by the Redeveloper, a private entity, in a purely private one to one transaction with another private party with defendants NCRC or RLA acting as the surrogate for the private party owner-sellers, through the use of the defendant's eminent domain authority.

57.  The actual non-pretextual purpose of the Skyland Legislation is to confer a benefit on a private party by enabling a private entity to acquire the Skyland Assemblage owned by other private parties, over their objection, by the use of defendant NCRC's eminent domain authority, in a one to one private transaction as described in the U.S. Supreme Court's decision in Kelo v. City of New London, which property would be redeveloped by the private entity purchaser for its own primary benefit, with defendant NCRC sharing in certain economic and financial benefits of the Skyland Project, the private undertaking.  None of the purposes or objectives of defendants D.C. or NCRC in undertaking the Skyland Project or enacting the Skyland Legislation  constitutes a public use or public purpose within the meaning of the Fifth Amendment.

58.  At all relevant times neither the Property nor any other properties in the Skyland Assemblage has been or now is a slum area or blighted area or otherwise eligible for the exercise of the power of eminent domain by defendants under the NCRC Act as amended, the Skyland Legislation or any other applicable law.

59.  Notwithstanding the foregoing, the Council inserted false, unfounded, irrelevant and pretextual findings in the Skyland Permanent Act in a wrongful, irrational and arbitrary attempt

to justify the exercise of eminent domain on the alleged grounds that the Skyland Center is blighted and that the Skyland Assemblage is otherwise eligible to be taken as a public use by the exercise of the power of eminent domain.

60.  In seeking to take and in taking plaintiffs' Property under the Skyland Legislation, defendant NCRC is violating plaintiffs' rights under 42 U.S.C. §1983, as amended, and is threatening to violate and is violating plaintiffs' rights under the Fifth Amendment as stated herein. Unless, defendant NCRC is temporarily, preliminarily and permanently enjoined and restrained from taking such action, plaintiffs will suffer irreparable harm to their unique and valuable leasehold and fee ownership property interests without just compensation, and will be forced to relocated their business from the Skyland Center which they would only be able to accomplish, if at all, at great cost and at a great loss of business and money.

61.  Upon information and belief, plaintiffs have no adequate or available state remedies.

COUNT II

(Taking In Violation of the Public Use Provisions of the Fifth Amendment
of the U.S. Constitution-Vagueness and Ambiguity)

62.  Plaintiffs repeat the allegations in paragraphs 1 through 52 hereof.

63.  The Skyland Permanent Act amends the NCRC Act in certain respects governing the powers of eminent domain that defendant NCRC may exercise.  Among other things, the Skyland Permanent Act adds a definition of a "project area" and a "slum area" to the NCRC Act, both being areas in which NCRC has authority to exercise eminent domain powers under the NCRC Act.  However, the Skyland Permanent Act does not describe, designate or define the Skyland Assemblage as a "project area", "slum area", "blighted area" or any of the other enumerated areas in which NCRC is authorized to exercise eminent domain powers under the NCRC Act.  Instead, the Skyland Permanent Act expressly ignores those defined terms and

28

areas, and the criteria and standards which those areas require for the exercise of eminent domain under the NCRC Act, and merely states that NCRC is authorized to exercise eminent domain over the Skyland Assemblage.

64.    Moreover, the Skyland Permanent Act does not state the public purpose or use for which the Skyland Assemblage is to be acquired, or what use is to be made of the Skyland Assemblage, what standards or requirements govern NCRC in acquiring, using or disposing of the Skyland Assemblage or that NCRC is subject to further review or approval by the Council before it may exercise eminent domain powers over the Skyland Assemblage.

65.    Further, section 3©) of the Skyland Permanent Act, which adds a new section 20©) to the NCRC Act creates in subsections (2) and (3) thereof an ambiguity and contradiction in the NCRC Act in that subsections (2) and (3) added by the new legislation authorize defendant NCRC or its subsidiary, defendant RLA, to commence eminent domain proceedings in their separate names under the NCRC Act without further recourse to or approval by the Council, whereas section 20(a) of the NCRC Act, which in relevant part is not amended by the Skyland Legislation, permits only NCRC to bring such eminent domain proceedings in its own name, not in the name of RLA, and requires to obtain Council approval before commencing such eminent domain proceeds.

66.    Thus, the Skyland Legislation permits NCRC or RLA to exercise eminent domain over the Skyland Assemblage without any standards or requirements whatsoever, and without further Council review or approval.  In doing so, the Skyland Legislation is impermissibly vague as to the purpose or use for which and manner in which defendants NCRC or RLA may exercise the power of eminent domain as to the Skyland Assemblage.

67.    Further, the Skyland Legislation is impermissibly ambiguous and contradictory as to the entity that may exercise eminent domain proceedings over the Skyland Assemblage or

any other property in the District of Columbia under the NCRC Act, as section 20(a) of the NCRC Act limits that authority to NCRC, and requires it to obtain Council approval before it may commence eminent domain proceedings, whereas section 20©) of that Act would authorize either NCRC or RLA to conduct such proceedings in its own name and without any further Council review or approval.

68.  Plaintiffs repeat the allegations in paragraphs 60 and 61 of this complaint.

COUNT III
(Deprivation of Property in Violation of the Due Process Provisions
of the Fifth Amendment of the U.S. Constitution)

69.  Plaintiffs repeat the allegations in paragraphs 1 through 67 hereof.

70.  Upon information and belief, one of the conditions set or relied on by the Council for the enactment of the Skyland Permanent Act, was the commitment of defendant NCRC that it or its redeveloper would have a commitment from an anchor retail (non-grocery) tenant, such as a Target department store, to lease space and establish a significant retail operation at the redeveloped Skyland Center before defendant NCRC would initiate any eminent domain proceedings under that act.

71.  Upon information and belief, there are no legal commitments between NCRC and its proposed redeveloper regarding the Skyland Project as of the date of this action.

72.  Notwithstanding the foregoing, upon information and belief, NCRC is now threatening to commence eminent domain proceedings against plaintiffs' Property, but neither NCRC nor its proposed private redeveloper has a commitment from such an anchor tenant satisfying the commitment made by defendant NCRC to the Council as a condition precedent for the enactment of the Skyland Permanent Act, or the exercise of the power of eminent domain thereunder..

73.  As a member of the class of persons and entities whose property would be acquired and who would be displaced by defendants NCRC or RLA in carrying out eminent domain proceedings for the Skyland Assemblage, plaintiffs will be deprived of their valuable and unique property without due process of law if defendant NCRC were to proceed without there being such a commitment.

74.  The failure of NCRC or the Redeveloper to have such an anchor tenant commitment before proceeding, and the failure of defendant Council to insist on the satisfaction of such condition before defendants NCRC or RLA are authorized to commence eminent domain proceedings under the Skyland Permanent Act constitute a violation of plaintiffs' due process rights and an unlawful deprivation of plaintiffs' Property without due process of law under the Fifth Amendment of the U.S. Constitution.

75.  Plaintiffs repeat the allegations in paragraphs 60 and 61 of this complaint.


COUNT IV
(Violation of D.C. Home Rule Act and Council Rules - Lack of Public Notice
of Council's Intent to adopt Skyland Permanent Act)

76.  Plaintiffs repeat the allegations in paragraphs 1 through 75 hereof.

77.  Upon information and belief, B15-752, prior to enactment as the Skyland Permanent Act, was improperly revised by the Council, in violation of the D.C. Home Rule Act and the Council's rules of procedure in the months after the enactment and expiration of the First and Second Skyland Emergency Acts and after the enactment and effectiveness of the Skyland Temporary Act, to include certain pretextual, wrong, inaccurate, baseless and irrelevant legislative findings by the Council, and to permit, without explanation, defendant RLA to bring such eminent domain proceedings in place of NCRC.  Defendant Council or an appropriate

committee thereof should have conducted a public hearing on said revisions of B15-752 on notice before B15-752 was so revised, considered and enacted as the Skyland Permanent Act by the Council.  By these actions, defendants prevented plaintiffs and others similarly situated from protesting such revisions and refuting such pretextual legislative findings, and thereby deprived plaintiffs, others similarly situated and other interested members fo the public from protesting such revisions to the Council before enactment of the Skyland Permanent Act.

78.  The failure of defendant Council to conduct such a public hearing on notice constitutes a violation of the D.C. Home Rule Act, Sec. 1-204.04 and Council Rule 422, and violates plaintiffs' and the public's right to receive due notice of such intended revisions of B15-752 and to comment thereon or object thereto before the Council acted on that measure

<u>COUNT V</u>
(Violation of the D.C. Home Rule Act - Duplicate Emergency Acts)

79.  Plaintiffs repeat the allegations in paragraphs 1 through 786 hereof.

80.  In enacting the Second Skyland Emergency Act, defendant DC, through the Council and the Mayor, violated D.C. Code Sec. 1-204.12 of the District of Columbia Home Rule Act, which does not permit enactment of more than one identical emergency measure based on the same emergency circumstances under the circumstances present in this action, which were not merely intended to maintain the status quo pending approval and Congressional review of pending legislation, namely the Skyland Temporary Act or the Skyland Permanent Act, but also to permit defendant NCRC to continue to take actions to carry out the Skyland Project, which were the objectives of the Skyland Temporary Act and the Skyland Permanent Act, in part as an alternative to that pending legislation.

81. Defendants D.C. and NCRC wrongfully caused the Council to enact and the Mayor to sign the Second Skyland Emergency Act on August 2, 2004, and it ostensibly became effective on that date and expired on October 31, 2004.

82. But for the Second Skyland Emergency Act becoming effective on August 2, 2004, there was no statutory authority for defendant NCRC to take any actions or expend or commit any funds concerning the Skyland Project or the Skyland Assemblage during the period beginning August 19, 2004 when the First Skyland Emergency Act expired and ending September 30, 2004 when the Skyland Temporary Act became effective.

83. Because of such lack of authority, each and every act, expenditure of funds and commitment by NCRC or any of its agents or contractors with respect to the Skyland Project or the Skyland Assemblage during the period beginning August 2, 2004 and ending September 30, 2004 was *ultra vires* and of no force or effect. Such ultra vires and nugatory actions included, among other things, obtaining appraisals of plaintiffs' Property and that of other Skyland Assemblage property owners.

84. As a result of the foregoing, plaintiffs have suffered economic harm and injury and have been threatened with the taking of their Property without just compensation or due process of law in violation of their U.S. constitutional rights and have suffered other harm and losses for all of which defendants are liable to plaintiffs for which defendants are liable to plaintiffs under 42 U.S.C. §1983.

85. Plaintiffs repeat the allegations in paragraphs 60 and 61 of this complaint.

<u>COUNT VI</u>
(Violation of the D.C. Home Rule Act - No Emergency)

86. Plaintiffs repeat the allegations in paragraphs 1 through 85 of this complaint.

87. Section 412, entitled "Emergency Legislation" of "Rules for the Council of the District of Columbia, Council Period XV Resolution of 2003"Council (the "Council Rules")

states the circumstances when the Council may consider and act on a bill due to emergency

circumstances and subsection (b) thereof states that

> an "emergency" means a situation that adversely affects the health, safety, welfare, or economic well-being of a person for which legislative relief is deemed appropriate and necessary by the Council, and for which adherence to the ordinary legislative process would result in delay that would adversely affect the person whom the legislation is intended to protect.

88.  Upon information and belief, the ostensible need to commence the negotiation

process with the Skyland Assemblage owners, given as the emergency in emergency

declarations Resolutions 15-556 and 15-622, and the need to show the commitment of

defendant D.C. to the Skyland Project, given as an additional justification in Resolution 15-566,

and, generally, the implementation of the Skyland Legislation, the acquisition of the Skyland

Assemblage and the carrying out of the Skyland Project, could not be undertaken until (a) at

least the Skyland Permanent Act was in full force and effect, and (b) defendants D.C. and

NCRC had the funds necessary to carry out acquisition of the Skyland Assemblage and to

undertake the Skyland Project.  Upon information and belief, defendants D.C. and NCRC knew

and understood those facts at all relevant times.

89.  B15-752 could have been enacted by the Council, signed by the Mayor and

submitted for 30 day Congressional review as  early as June, 2004.  Passing such Congressional

review, B15-752, the Skyland Permanent Act, could have become law in September, 2004,

seven months before it actually became law.

90.  Upon information and belief, at all relevant times defendants D.C. and NCRC

planned to and did  delay enactment of the Skyland Permanent Act to the latest possible date in

Council Period XV to avoid opposition to and unfavorable criticism of the Skyland Permanent

Act and the Skyland Project and to permit revisions to B15-752, among other things, to attempt

to remedy any perceived defects to the greatest extent possible.

91.  Upon information and belief, the power to exercise eminent domain with regard to the Skyland Assemblage or to commence negotiations with the Skyland Assemblage owners or to show D.C.'s commitment to the project were not needed by defendant NCRC on an emergency basis within the meaning of Section 412 of the Council's Rules at the time of Resolutions 15-556 and 15-622 or at any other time.  Upon information and belief, defendants D.C. and NCRC knew and understood those facts at all relevant times.

92.  There was no "emergency" within the meaning of Sec. 412 of the Council Rules at the time of Resolutions 15-556 and 15-622 with respect to First and Second Skyland Emergency Acts; and, thus, under Rule 413 of the Council Rules, there was no basis for the introduction or enactment of the Skyland Temporary Act.  Upon information and belief, as of the date of this complaint, defendant NCRC still has not acquired any property in the Skyland Assemblage.

93.  But for the First and Second Skyland Emergency Act and the Skyland Temporary Act becoming effective as early as May 21, 2004, there was no statutory authority for defendant NCRC to take any actions or expend or commit any funds concerning the Skyland Project or the Skyland Assemblage during the period beginning May 21, 2004 and ending April 5, 2005 when the Skyland Permanent became effective.

94.  As a result of the foregoing, the First and Second Skyland Emergency Acts and the Temporary Act were impermissibly and arbitrarily, irrationally and capriciously enacted by defendant D.C. and implemented by defendant NCRC.

95.  Plaintiffs repeat the allegations in paragraphs 82 and 83 of this complaint.

<u>RELIEF REQUESTED</u>

WHEREFORE, plaintiffs requests judgment against defendants, jointly and severally, as follows:

35

(I)  On Counts I and II, declaratory judgment that the Skyland Legislation is unconstitutional and in violation of the Takings Clause of the Fifth Amendment of the United States Constitution and 42 U.S.C. §1983;

(ii)  On Count III, declaratory judgment that the Skyland Legislation is unconstitutional and in violation of the Takings Clause of the Fifth Amendment of the United States Constitution and the Due Process Clause of the Fifth Amendment and 42 U.S.C. §1983;

(iii) On Count IV, declaratory judgment the Skyland Permanent Act was enacted in violation of the D.C. Home Rule Act and the Council Rules and is null and void and of no force and effect, and that all actions and commitments of defendants NCRC and D.C. and their respective contractors and agents in undertaking the Skyland Project during the period from April 5, 2005 to the entry of judgment in this action are null and void and of no force and effect;.

(iv)  On Count V, declaratory judgment that the Second Skyland Emergency Act was enacted in violation of the D.C. Home Rule Act and is null and void and of no force and effect, and that all actions and commitments of defendants NCRC and D.C. and their respective contractors and agents in undertaking the Skyland Project during the period from August 19, 2004 until September 30, 2004 are null and void and of no force and effect;

(v)  On Count VI, declaratory judgment that the First and Second Skyland Emergency Acts and Skyland Temporary Act were enacted in violation of the D.C. Home Rule Act and are null and void and of no force and effect, and that all actions and commitments of defendants NCRC and D.C. and their respective contractors and agents in undertaking the Skyland Project during the period May 21, 2004 through April 5, 2005 are null and void and of no force and effect;

(vi)  On all counts, temporary, preliminary and permanent injunctions against defendants D.C., NCRC and RLA enjoining and restraining said defendants from taking any action to implement the Skyland Legislation or to acquire any property interests in the Skyland Assemblage or to other wise take any action in furtherance of the Skyland Project, and affirmatively requiring defendants D.C., NCRC and RLA to restore the *status quo ante* with regard to the ownership of the Skyland Assemblage and the Property;

(vii)  Granting plaintiffs damages for the losses and harm they suffered as a result of the actions of the defendants in enacting the Skyland Legislation and in their efforts to acquire, and in acquiring plaintiffs' Property and to carry out the Skyland Project;

(viii)  Granting plaintiffs reasonable attorneys fees and expenses and the costs of this action; and

(ix)  Granting plaintiffs such other and further relief as the Court may deem just and proper.

                      ____/s/_____
                      Ralph Werner, D.C. Bar No. 88161
                      1020 Nineteenth Street, N.W., Suite 400
                      Washington, D.C. 20036
                      (202) 331-8940
                      Attorney for Plaintiffs